Moez M. Kaba, State Bar No. 257456
mkaba@hueston.com
Josh Burk, State Bar No. 313869
jburk@hueston.com
Abigail Majane, State Bar No. 330347
amajane@hueston.com
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:  (213) 788-4340
Facsimile:   (888) 775-0898

*Attorneys for Defendant*
*CoreLogic Credco, LLC*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO A. FERNANDEZ, individually and as a representative of the class,<br><br>Plaintiff,<br><br>vs.<br><br>CORELOGIC CREDCO, LLC,<br><br>Defendant. | Case No. 20-cv-1262-JM-AGS<br><br>**DECLARATION OF JOSH BURK IN SUPPORT OF DEFENDANT CORELOGIC CREDCO, LLC'S MOTION TO STAY PROCEEDINGS PENDING THE SUPREME COURT'S DECISION IN *TRANSUNION LLC V. RAMIREZ***<br><br>Judge: Honorable Jeffrey T. Miller<br><br>Hearing Date: February 8, 2021<br>Time:              10:00 a.m.<br>Courtroom:      5D<br><br>Action filed:   June 2, 2020<br>F.A.C. filed:   Sept. 28, 2020 |

5880771

I, Josh Burk, do hereby state and declare as follows:

1.    I am an attorney at law duly admitted to practice before this Court.  I am an attorney with the law firm of Hueston Hennigan LLP, and counsel of record for Defendant CoreLogic Credco, LLC ("Defendant") in the above-captioned matter.  The facts set forth in this Declaration are within my own personal knowledge or based on information and belief, and if called as a witness, I could and would competently so testify.  I make this Declaration in support of Defendant's Motion to Stay Proceedings Pending the Supreme Court's Decision in *Transunion LLC v. Ramirez*, which is filed concurrently herewith.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of the petition for writ of certiorari filed by TransUnion LLC on September 2, 2020.

3.    Attached hereto as **Exhibit 2** is a true and correct copy of the complaint filed by Sergio L. Ramirez against TransUnion LLC on February 8, 2012 (No. 3:12-cv-00632-JSC, N.D. Cal.).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of January, 2021 at Los Angeles, California.

_____
Josh Burk

5880771

# EXHIBIT 1

No.

# In the
# Supreme Court of the United States

TRANS UNION LLC,

*Petitioner*,

v.

SERGIO L. RAMIREZ,

*Respondent.*

**On Petition for Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

**PETITION FOR WRIT OF CERTIORARI**

JULIA B. STRICKLAND
STEPHEN J. NEWMAN
CHRISTINE E. ELLICE
STROOK & STROOK
& LAVIN LLP
2029 Century Park E.
Los Angeles, CA 90067

PAUL D. CLEMENT
  *Counsel of Record*
ERIN E. MURPHY
MATTHEW D. ROWEN
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Petitioner*

September 2, 2020

# QUESTIONS PRESENTED

This petition arises out of a Fair Credit Reporting Act class action in which the named plaintiff suffered atypical injuries and the vast bulk of the class suffered no Article III injury at all. The named plaintiff claimed that an inaccurate credit report hindered his effort to secure credit, caused him embarrassment in front of family, and led him to cancel a vacation. Yet he sought to represent a class of thousands of individuals, the vast majority of whom (>75%) never had a credit report disseminated to any third party, let alone suffered a denial of credit or other injury anything like the class "representative." The trial court nonetheless let the class proceed on the theory that the absent class members all suffered Article III injury and that the vast differences between the experiences of the named plaintiff and the class he purported to represent were immaterial. The results were predictable. Having heard only about the named plaintiff's entirely atypical injuries, the jury awarded the entire class statutory damages near the statutory maximum and then awarded classwide punitive damages that dwarfed the statutory damages. In a 2-1 decision, the Ninth Circuit then affirmed across the board, save for minimally trimming the punitive damages award.

The questions presented are:

1. Whether either Article III or Rule 23 permits a damages class action where the vast majority of the class suffered no actual injury, let alone an injury anything like what the class representative suffered.

2. Whether a punitive damages award that is multiple times greater than an already-substantial

classwide award of statutory damages, and is orders of magnitude larger than any actual proven injury, violates due process.

**PARTIES TO THE PROCEEDING**

Petitioner, and defendant-appellant below, is TransUnion LLC.

Respondents, and plaintiffs-appellees below, are Sergio L. Ramirez and 8,184 absent class members "to whom Trans Union sent a letter similar in form to the March 1, 2011 letter Trans Union sent to [Ramirez] regarding 'OFAC (Office of Foreign Assets Control) Database' from January 1, 2011-July 26, 2011."

**CORPORATE DISCLOSURE STATEMENT**

Trans Union LLC is a wholly owned subsidiary of TransUnion Intermediate Holdings, Inc. TransUnion Intermediate Holdings, Inc. is wholly owned by TransUnion. TransUnion is a publicly traded entity with the ticker symbol TRU. Investment funds affiliated with T. Rowe Price Group, Inc., a publicly traded entity with the ticker symbol TROW, own more than 10 percent of TransUnion's stock.

## STATEMENT OF RELATED PROCEEDINGS

This case arises from the following proceedings:

- *Trans Union LLC v. Sergio L. Ramirez*, No. 14-80109 (9th Cir.) (opinion denying permission to appeal district court's certification of class, filed Dec. 2, 2014);

- *Sergio L. Ramirez v. Trans Union, LLC*, No. 3:12-cv-00632-JSC (N.D. Cal.) (order certifying class, filed July 24, 2014) (judgment signed June 21, 2017); and

- *Sergio L. Ramirez v. Trans Union LLC*, No. 17-17244 (9th Cir.) (opinion affirming in large part and vacating and remanding in part with instructions to reduce punitive damages, issued Feb. 27, 2020).

There are no other proceedings in state or federal trial or appellate courts, or in this Court, directly related to this case within the meaning of this Court's Rule 14.1(b)(iii).

# TABLE OF CONTENTS

QUESTIONS PRESENTED..........................................i

PARTIES TO THE PROCEEDING ..........................iii

CORPORATE DISCLOSURE STATEMENT...........iv

STATEMENT OF RELATED PROCEEDINGS........ v

TABLE OF AUTHORITIES....................................viii

PETITION FOR WRIT OF CERTIORARI ................ 1

OPINIONS BELOW .................................................. 4

JURISDICTION ........................................................ 5

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED.....................................5

STATEMENT OF THE CASE .................................. 5

    A.   Legal and Factual Background....................5

    B.   District Court Proceedings......................... 10

    C.   The Ninth Circuit's Opinion ...................... 13

REASONS FOR GRANTING THE PETITION....... 16

I.   The Decision Below Conflicts With Cases Of This Court And Other Circuits On Basic Principles Of Article III And Rule 23 .............. 18

    A.   The Conclusion That Every Absent Class Member Had Article III Standing Is Wrong and Creates a Circuit Split ............ 18

    B.   The Conclusion That Ramirez Was Typical of the Class Defied Reality as Well as This Court's Rule 23 Precedents .. 26

II.  The Ninth Circuit's Punitive Damages Analysis Defies Due Process And This Court's Cases ................................................................. 28

III. The Questions Presented Are Exceptionally
Important ............................................................ 31

CONCLUSION ....................................................... 36

APPENDIX

Appendix A

Opinion, United States Court of
Appeals for the Ninth Circuit, *Ramirez
v. TransUnion LLC*, No. 17-17244
(Feb. 27, 2020) ........................................... App-1

Appendix B

Order, United States Court of Appeals
for the Ninth Circuit, *Ramirez
v. TransUnion LLC*, No. 17-17244
(Apr. 8, 2020) ........................................... App-59

Appendix C

Order, United States District Court for the
Northern District of California, *Ramirez v.
TransUnion LLC*, No. 12-cv-00632-JSC
(Nov. 7, 2017) ........................................... App-61

Appendix D

Relevant Constitutional and Statutory
Provisions and Federal Rule .................... App-91

U.S. Const. art. III, §§1-2 ......................... App-91

U.S. Const. amend. XIV, §1 ....................... App-92

15 U.S.C. §1681e ....................................... App-92

15 U.S.C. §1681g ....................................... App-96

15 U.S.C. §1681n ....................................... App-117

Fed. R. Civ. P. 23 ...................................... App-118

# TABLE OF AUTHORITIES

## Cases

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)................................................ 31

*Barr v. Am. Ass'n of Pol. Consultants*,
  140 S.Ct. 2335 (2020)............................................ 34

*Braitberg v. Charter Commc'ns, Inc.*,
  836 F.3d 925 (8th Cir. 2016)................................. 24

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)................................................ 31

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)..................................... 3, 19, 21

*Coopers & Lybrand v. Livesay*,
  437 U.S. 463 (1978)................................................ 32

*Cortez v. Trans Union LLC*,
  617 F.3d 688 (3d Cir. 2010) ................................... 7

*Dreher v. Experian Info. Sols., Inc.*,
  856 F.3d 337 (4th Cir. 2017)............................ 22, 25

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008)................................................ 28

*Feltner v. Columbia Pictures Television, Inc.*,
  523 U.S. 340 (1998)................................................ 32

*Flecha v. Medicredit, Inc.*,
  946 F.3d 762 (5th Cir. 2020)............................ 17, 25

*Gillespie v. Equifax Info. Servs., L.L.C.*,
  484 F.3d 938 (7th Cir. 2007)............................. 6, 22

*Groshek v. Time Warner Cable, Inc.*,
  865 F.3d 884 (7th Cir. 2017)................................. 25

*Gubala v. Time Warner Cable, Inc.*,
  846 F.3d 909 (7th Cir. 2017)................................. 24

*Huff v. TeleCheck Servs., Inc.*,
  923 F.3d 458 (6th Cir. 2019)..................................25

*Lompe v. Sunridge Partners, LLC*,
  818 F.3d 1041 (10th Cir. 2016).............................30

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)............................................23

*Massachusetts v. EPA*,
  549 U.S. 497 (2007).............................................26

*On Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001) ..................................29

*Owner-Operator Indep. Drivers Ass'n, Inc.
  v. U.S. Dep't of Transp.*,
  879 F.3d 339 (D.C. Cir. 2018)......................... 17, 24

*Parker v. Time Warner Ent. Co.*,
  331 F.3d 13 (2d Cir. 2003) ....................................33

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007)............................................5, 15

*Spokeo, Inc. v. Robins*,
  136 S.Ct. 1540 (2016)....................................*passim*

*St. Louis, I. M. & S. Ry. Co. v. Williams*,
  251 U.S. 63 (1919).................................................29

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)......................................*passim*

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)..............................................26

*United States v. SCRAP*,
  412 U.S. 669 (1973)..............................................23

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).........................................26, 31

*Williams v. ConAgra Poultry Co.*,
  378 F.3d 790 (8th Cir. 2004) ................................. 31

**Statutes**

12 U.S.C. §3417(a) .............................................. 34

15 U.S.C. §1640(a) .............................................. 34

15 U.S.C. §1681a(d) .............................................. 5

15 U.S.C. §1681a(f) .............................................. 5

15 U.S.C. §1681a(g) ............................................. 10

15 U.S.C. §1681e(b) ......................................... 6, 10

15 U.S.C. §1681g(a) ..................................... 6, 11, 21

15 U.S.C. §1681g(c) ..................................... 6, 11, 21

15 U.S.C. §1681n ............................................... 34

15 U.S.C. §1681n(a) ............................................ 29

15 U.S.C. §1692k(a) ............................................ 34

18 U.S.C. §248(c) .............................................. 34

18 U.S.C. §2520 ............................................... 34

**Rule and Regulation**

Fed. R. Civ. P. 23(a) .......................................... 26

31 C.F.R. §501 app. A, II ....................................... 7

**Other Authorities**

FTC, *Report to Congress Under Sections 318
  and 319 of the Fair and Accurate Credit
  Transactions Act of 2003* (Dec. 2004) ...................... 7

James A. Henderson, Jr., *The Impropriety of
  Punitive Damages in Mass Torts*, 52 Ga. L.
  Rev. 719 (2018) ........................................... 32

*Office of Foreign Assets Control - Santions
Programs and Information*, U.S. Dep't of
the Treasury, http://bit.ly/1VZNDSI (last
visited Aug. 31, 2020) ............................................... 7

*The 2018 Carlton Fields Class Action Survey*
(2018), https://bit.ly/2WBMs17 ............................ 32

## PETITION FOR WRIT OF CERTIORARI

The jury's verdict here reflected a perfect storm of standing, class certification, and punitive damages problems, combining to give rise to a multimillion-dollar damages award in a case with no proven injury to anyone beyond the named plaintiff. In the course of affirming more than $40 million in statutory and punitive damages for highly technical (and highly debatable) violations of the Fair Credit Reporting Act ("FCRA"), the Ninth Circuit eviscerated critical Article III, Rule 23, and due process constraints, thereby paving the way for one highly atypical plaintiff to recover massive damages on behalf of thousands of uninjured class members. That outlier decision conflicts with the decisions of this Court and other circuits, and it cries out for this Court's review. And given that this is the rare class action that was litigated to final judgment, this is an ideal case in which to consider these critical issues.

Sergio Ramirez suffered difficulty in obtaining credit and embarrassment in front of family members when an automobile dealer received a credit report indicating that Ramirez's name matched a name on a government list of persons with whom U.S. businesses may not transact. In response, he initiated a class action alleging three violations of FCRA's procedural requirements. But Ramirez was not content to represent a class of individuals who, like himself, had allegedly inaccurate information disseminated to potential lenders let alone individuals who experienced difficulty in obtaining credit as a result. Instead, he sought to represent a much larger class of consumers who never had their credit reports

disseminated to any third party during the class period and instead simply received the information themselves as part of a statutory process that allows consumers to request a copy of their credit reports so that they can identify and correct any errors. In fact, Ramirez *stipulated* that more than 75% of his proposed class did *not* have a report disseminated to a third party during the class period. And he made no effort to prove that any other class member ever read the letter from TransUnion or was even aware that such a letter had been sent, let alone that any other class member suffered injury (or even embarrassment) on account of the claimed deficiencies in how TransUnion provided the "potential match" information.

The district court nonetheless allowed the class action to proceed, with the jury hearing at trial only about Ramirez and his entirely atypical injury and experiences. The results were predictable. The jury awarded every member of the 8,185-member class near the maximum in statutory damages and thousands more in punitive damages, for a total award of over $60 million in a case where the vast bulk of class members never had a credit report disseminated to a third party, let alone suffered any injury as a result. A divided panel of the Ninth Circuit affirmed in large measure, pausing only to reduce the punitive damages award to four times the $8 million statutory damages award, even as it acknowledged that the latter was "quite substantial." App.48. *But see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("When compensatory damages are substantial, then a … ratio[] perhaps only equal to compensatory damages[] can reach the outermost

limit of the due process guarantee."). That decision is wrong at every turn.

First, as Judge McKeown explained in her dissent, the majority's conclusion that every class member suffered Article III injury-in-fact simply because TransUnion's credit files contained allegedly inaccurate information about them cannot be reconciled with this Court's precedent or decisions of other courts faithfully applying it. As this Court has made clear, Article III requires an injury that is both "concrete and particularized," *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1545 (2016) (emphasis omitted), and "*certainly impending*," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Applying those principles, the D.C. Circuit has squarely held that plaintiffs lack standing to seek damages under FCRA based on the bare existence in their credit files of information never disseminated to any third party. And multiple circuits have concluded that plaintiffs lack standing to challenge allegedly deficient disclosures when there is no evidence that they even read, let alone failed to understand, them.

While the Article III standing rules applied by most circuits would stop a class like this one at the threshold, the Ninth Circuit's treatment of Rule 23 is a profound outlier. Even if absent class members who never had their credit information disseminated to a third party somehow crossed the Article III threshold, their injuries were nothing like the actual, concrete injuries suffered by the named plaintiff. Yet the Ninth Circuit found no problem with a trial focused on Ramirez's "unique circumstances" to the exclusion of any "story of the absent class members." App.51, 53

4

(McKeown. J. concurring in part and dissenting in part). Adding insult to (lack of) injury, the court also refused to reduce the *punitive* damages award below a 4:1 ratio to an $8 million *statutory* damages award even though statutory damages are not a measure of the actual harm the plaintiffs suffered, *State Farm*, 538 U.S. at 425, but are instead designed to accomplish the same punishment and deterrence objectives as punitive damages. Indeed, Ramirez's lawyers urged the jury to award the highest possible statutory damages to impose the "maximum penalty" on TransUnion. CA9.ER258.

The combined effect of those profoundly flawed holdings is that thousands of absent class members have been awarded thousands of dollars for injuries that never occurred. Indeed, it is no exaggeration to say that, for many (if not most) of the 8,184 absent class members, their first indication that they were "injured" will come when they receive a $4,921.10 check (reduced by class counsel's cut) in the mail. Making matters worse, the decision below provides a roadmap for how to (ab)use statutory damages provisions by using atypically sympathetic plaintiffs to secure massive awards on behalf of uninjured individuals, and then use those statutory damages to justify outsized punitive damage awards. Any one of the majority's missteps en route to that untenable result readily warrants this Court's review. Together, they compel it.

## OPINIONS BELOW

The Ninth Circuit's opinion is reported at 951 F.3d 1008 and reproduced at App.1-58. The district court's order denying TransUnion's post-trial motions

is available at 2017 WL 5153280 and reproduced at App.61-90.

## JURISDICTION

The Ninth Circuit issued its opinion on February 27, 2020, and issued its order denying rehearing en banc on April 8, 2020. App.1-60. On March 19, 2020, this Court "extended" "the deadline to file any petition for a writ of certiorari due on or after" that date "to 150 days." This Court has jurisdiction under 28 U.S.C. §1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The relevant provisions of FCRA, 15 U.S.C. §§1681-81x, are reproduced at App.92-118. Federal Rule of Civil Procedure 23 is reproduced at App.118-28. Article III, §§1-2 of the United States Constitution is reproduced at App.91-92. The Due Process Clause, U.S. Const. amend. XIV, §1, is reproduced at App.92.

## STATEMENT OF THE CASE

### A. Legal and Factual Background

1. Congress enacted FCRA "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). To that end, FCRA "regulates the creation and the use of 'consumer report[s]' by 'consumer reporting agenc[ies]' for certain specified purposes, including credit transactions, insurance, licensing, consumer-initiated business transactions, and employment." *Spokeo*, 136 S.Ct. at 1545 (footnotes omitted); *see* 15 U.S.C. §1681a(d)(1) (defining "consumer report"); *id.* §1681a(f) (defining "consumer reporting agency").

"FCRA imposes a host of requirements concerning the creation and use of consumer reports." *Spokeo*, 136 S.Ct. at 1545. Three of its procedural requirements are at issue here. The first is §1681e(b), which falls under FCRA's "Compliance procedures" section and requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy" when preparing a credit report. 15 U.S.C. §1681e(b). The other two are disclosure requirements. Under §1681g(a)(1), each "consumer reporting agency shall, upon request, … clearly and accurately disclose to the consumer … [a]ll information in the consumer's file." And under §1681g(c)(2), each "consumer reporting agency shall provide to a consumer, with each written disclosure," a "summary of rights" as outlined in §1681g(c)(1). The "primary purpose[]" of these latter requirements "is to allow consumers to identify inaccurate information in their credit files and correct this information via the grievance procedure established under §1681i." *Gillespie v. Equifax Info. Servs., L.L.C.*, 484 F.3d 938, 941 (7th Cir. 2007).

2. In addition to preparing consumer credit reports, TransUnion offers a product variously known as "OFAC Name Screen Alert," "Name Screen," or "OFAC Advisor." OFAC refers to the U.S. Treasury Department's Office of Foreign Assets Control, which "administers and enforces economic and trade sanctions based on US foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the

United States." *Office of Foreign Assets Control -
Santions Programs and Information*, U.S. Dep't of the
Treasury, http://bit.ly/1VZNDSI (last visited Aug. 31,
2020).  OFAC publishes a list of individuals, known as
specifically designated nationals, or "SDNs," with
whom U.S. businesses are forbidden to transact; doing
business with an individual on the OFAC list "may
result in civil as well as criminal penalties." *Cortez v.
Trans Union LLC*, 617 F.3d 688, 696, 701 (3d Cir.
2010); *see* 31 C.F.R. §501 app. A, II.  Businesses use
Name Screen to assist in complying with their OFAC
obligations.

When this litigation arose, Name Screen worked
as follows:  When a lender ran a credit-check on an
applicant, in addition to pulling the individual's credit
report, TransUnion would use third-party software
and data to screen the person's name against the
OFAC list.  If the name appeared to match that of an
individual on the list, TransUnion would place an
alert on the report, stating that the "name" was a
"potential match" to a name on the OFAC list.  App.6-
7.

The reporting of "potential matches" to names on
the OFAC list, even though other information (like
date of birth) could disprove an actual match, is part
of the trade-off inherent in the credit-check process.
"[A] 'stricter' matching algorithm" could "reduce[]
inaccuracy," *i.e.*, false positives.  FTC, *Report to
Congress Under Sections 318 and 319 of the Fair and
Accurate Credit Transactions Act of 2003* at 46 (Dec.
2004).    But it would also mean that
"incompleteness" *i.e.*, false *negatives* "will
increase," *id.*, which is no small problem for

businesses given the harsh penalties for doing business with an SDN. In light of those penalties, lenders have a strong interest in an OFAC product that casts a wide initial net and then relies on a lender's human judgment to determine whether a credit applicant whose name *potentially* matches an SDN's is *actually* on the OFAC list.

Given the limited nature of the information supplied, TransUnion made crystal clear to its customers that a Name Screen alert should be the beginning, not the end, of their OFAC screening. Not only did TransUnion advise that clients "shall not deny or otherwise take any adverse action against any consumer based solely on [Name Screen]," CA9.ER393, but its terms of service further provided:

> Client further certifies that in the event that a consumer's name matches a name contained in the information, it will contact the appropriate government agency for confirmation and instructions. Client understands that a "match" may or may not apply to the consumer whose eligibility is being considered by Client, and that in the event of a match, Client should not take any immediate adverse action in whole or in part until Client has made such further investigations as may be necessary (i.e., required by law) or appropriate (including consulting with its legal or other advisors regarding Client's legal obligations).

CA9.ER212 (emphases omitted).

3. On February 28, 2011, Sergio Ramirez and his wife visited Dublin Nissan along with his father-in-

law, looking to buy a car. Both Ramirez and his wife completed a credit application. Despite TransUnion's express instruction that reports should describe an individual's name only as a "*potential* match" to a name on the OFAC list (as opposed to a "match"), the advisory on Ramirez's report, which the dealer obtained through a third-party reseller called DealerTrack, noted that the "INPUT NAME MATCHES NAME[S] ON THE OFAC DATABASE," and listed two names: Sergio Humberto Ramirez Aguirre, born 11/22/1951; and Sergio Alberto Cedula Ramirez Rivera, born 1/14/196*. App.4. Respondent is neither of those individuals, and he has a different birthdate. The dealership nonetheless recommended, in violation of TransUnion's express instructions, that Ramirez and his wife purchase the car in her name alone, which they did.

Ramirez called TransUnion the next day. The person with whom he spoke informed him that there was no OFAC alert in his report. Ramirez asked for a copy of his file; TransUnion mailed him one; the file did not include any OFAC information. A few days later, however, Ramirez received a separate letter from TransUnion, dated March 1, 2011 the same day he called TransUnion that stated:

> [Y]ou recently requested a disclosure of your TransUnion credit report. That report has been mailed to you separately. As a courtesy to you, we also want to make you aware that the name that appears on your TransUnion credit file "SERGIO L. RAMIREZ" is considered a potential match to information listed on the [OFAC] Database.

App.6. The letter also explained the OFAC list, provided the "potential match[es]," and advised that "[i]f you have any additional questions or concerns, you can contact TransUnion at 1-855-525-5176." *Id.*; CA9.ER467.

That information was sent in a separate mailing because the OFAC information was not housed in the files TransUnion keeps on consumers; rather, it was generated through a screen performed only when a lender actually requested a credit check or (as in Ramirez's case) a consumer requested a copy of his or her credit file.[1] After receiving the letter, Ramirez contacted TransUnion via the number it provided and succeeded in getting TransUnion to exclude the OFAC alert from all of his future credit reports. CA9.ER413-16. But in the meantime, Ramirez canceled an impending vacation to Mexico out of concern about the alert. CA9.ER257-28.

### B. District Court Proceedings

1. Ramirez sued, alleging that TransUnion violated its obligation under FCRA to maintain reasonable procedures to assure maximum possible accuracy of the information in its consumer reports. *See* 15 U.S.C. §1681e(b). He also alleged that TransUnion violated two additional FCRA procedural requirements. First, he alleged that TransUnion violated its obligation to provide consumers, upon request, with all information in their files, *see id.*

---

[1] "The term 'file,' when used in connection with information on any consumer, means all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored." 15 U.S.C. §1681a(g).

§1681g(a), because it provided the OFAC "potential match" information in a separate mailing sent contemporaneously with his credit file. Second, he alleged that TransUnion violated its obligation to provide consumers with a summary of their rights with each file disclosure, *see id.* §1681g(c), because it included the summary in the mailing containing his credit file, but not in the contemporaneous-but-separate OFAC-alert mailing. Ramirez alleged that these violations were willful, and that he was therefore entitled to statutory and punitive damages under §1681n(a). App.15.

Although Ramirez's claims stemmed from his unique experience and injuries  namely, having an OFAC alert disseminated to a lender with a report describing his name as a "match" rather than a "potential match," suffering resulting credit complications at a retail outlet in front of his wife and father-in-law, and cancelling his planned vacation as a result  he sought to certify a class of very differently situated individuals. In particular, he sought to include in his class everyone who received a letter from TransUnion at their mailing address between January and July 26, 2011, informing them that their name was a "potential match" to one on the OFAC list. App.14; CA9.ER40-41. So defined, the class included individuals who received their own credit information at home but never had their reports sent to any third party. Indeed, Ramirez stipulated that less than 25% of class members had a report disseminated to a third party during the class period, App.14-15, and he offered no evidence that anyone besides himself was ever hindered in obtaining credit due to an OFAC alert.

The district court acknowledged the "litany of unique facts involved with [Ramirez's] claims," as well as the fact that Ramirez had provided no reason to believe that anyone else in the class suffered any adverse consequences due to the alleged violations. Dist.Ct.Dkt.140 at 12. But it nonetheless certified the class over TransUnion's objections that the other class members lacked standing and that Ramirez was radically atypical of the class he purported to represent, finding the distinctions between Ramirez and the absent class members "not material." Dist.Ct.Dkt.140 at 12, 24. TransUnion moved to decertify after this Court decided *Spokeo*, but the district court denied that motion. Dist.Ct.Dkt.209.

2. Although Ramirez's experiences were entirely atypical of the broad class he purported to represent, "the trial … opened with class counsel telling jurors that they would learn 'the story of Mr. Ramirez'" and closed with a dramatic narration of Ramirez's unique experience at the car dealership, with scant evidence of anyone else's experiences in between. App.53 (McKeown, J., concurring in part and dissenting in part). Indeed, "the hallmark of the trial was the absence of evidence about absent class members." App.54.

Ramirez presented no evidence of absent class members' purported injuries because there was none. Ramirez stipulated that only 1,852 of the 8,814 absent class members had a report disseminated to a third party during the class period and even as to those 1,852, he provided no evidence about the nature or impact of the dissemination. Nor did Ramirez introduce any evidence that any absent class member

even opened the mailings from TransUnion, let alone that anyone was confused or distressed on account of receiving the requisite information about their credit files in two contemporaneous mailings instead of one. In short, while the jury heard repeatedly of Ramirez's humiliation at the Nissan dealership and resulting injuries, *see, e.g.*, CA9.ER257-28 ("He was scared. He was embarrassed. He was shocked. He canceled his vacation to Mexico because he wasn't sure what was going to happen…."), it heard nothing about the experience of a typical class member.

Having heard only of Ramirez's highly atypical experience, the jury found for the class on all claims and awarded every class member $984.22 in statutory damages just shy of the $1,000 statutory maximum under §1681n(a). App.72. The jury awarded an additional $6,353.08 per class member in punitive damages 6.5 times the statutory damages award and incalculably higher than any actual proven damage bringing the total verdict for the class to more than $60 million. App.78.

## C. The Ninth Circuit's Opinion

Over a dissent from Judge McKeown, the Ninth Circuit affirmed all aspects of the proceedings, except the punitive damages award, which it found unconstitutionally excessive but reduced only to a 4:1 ratio of punitive damages to statutory damages (not actual harm). The majority began by agreeing with TransUnion (and Judge McKeown) "that each member of a class certified under Rule 23 must satisfy the bare minimum of Article III standing at the final judgment stage of a class action in order to recover monetary damages in federal court." App.17. But it then

proceeded to find that every class member had standing, even though Ramirez stipulated that more than 75% of them never had a credit report disseminated to a third party and "presented no evidence about the consequences of dissemination of the reports for" the rest. App.55 (McKeown, J., concurring in part and dissenting in part).

On the reasonable-procedures claim, the majority held that the bare fact "that TransUnion made [credit] reports available to numerous potential creditors and employers" *i.e.*, the bare fact that a report would have been provided if, contrary to fact, a creditor had asked for one "suffic[ed] to show a material risk of harm to the concrete interests of all class members." App.27. On the disclosure claims, the majority held that the mailings were "inherently shocking and confusing" and thus that every class member suffered concrete injury simply by virtue of having received two envelopes instead of one, and having received a statement of rights in only one of those two envelopes, even though Ramirez presented no evidence that any absent class member so much as opened the mailings, let alone experienced any "shock or confusion." App.32 n.10.

Turning to class certification, the majority did not dispute that, of the 8,185-member class, only "Ramirez's alert stated that he was a match" (as opposed to "a *potential* match"), only "Ramirez was denied credit because of the alert," and only Ramirez "spent significant time and energy trying to remove the alert." App.39. Yet it summarily concluded that "these differences do not defeat typicality." App.39. According to the majority, "the unique aspects of

Ramirez's claims" including, *e.g.*, the fact that he was *actually hindered in seeking credit*, rather than exposed (at most) to a risk that a denial could occur were not so "significant … that they 'threaten[ed] to become the focus of the litigation,'" App.40 even though that is *in fact* exactly what happened, App.51-54 (McKeown, J., concurring in part and dissenting in part).

Finally, after affirming the sufficiency of the evidence to establish both FCRA violations and willfulness, App.19-38; *but see Safeco Ins.*, 551 U.S. at 68-69 (willfulness requires proof that defendant "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless"), the majority held "that the jury's award of statutory damages near the high end of the range was clearly justified." App.49. "With respect to punitive damages," however, it found $6,353.08 per class member "excessive" and "remand[ed] with instructions to reduce [that amount] to $3,936.88 per class member." App.50 (capitalization altered). While this Court has admonished that "[w]hen compensatory damages are substantial," a ratio "equal to compensatory damages[] can reach the outermost limit of the due process guarantee," *State Farm*, 538 U.S. at 425, and the majority acknowledged that the $8 million statutory damages award was "quite substantial," App.47, it nonetheless reduced the punitive damages award only to a ratio of 4:1.

Judge McKeown dissented in significant part. She first noted that "[t]he only asserted uniform classwide experience was the existence of TransUnion's internal terrorist watch list alerts and

the mailing of separate letters   faint allegations that strain Rule 23's typicality requirements."   App.52 (McKeown, J., concurring in part and dissenting in part).  She then explained how that Rule 23 problem flowed from an even more fundamental problem:  a lack of Article III standing.

With respect to the reasonable-procedures claim, Judge McKeown concluded that only "the 1,853 individuals whose report was disclosed to third parties have standing."  App.56.  In her view  and, as she noted, the views of at least three other circuits, App.56  the mere potential that a credit report *could be* divulged to potential creditors "does not amount to a material risk" sufficient for Article III.  App.56.  As to the disclosure claims, given the complete lack of evidence vis-à-vis anyone but Ramirez, Judge McKeown concluded that "whether any … absent class member was confused, suffered the adverse consequences that befell Ramirez, or even opened the letter, is pure conjecture," App.57  and "[c]onjecture based on an unrepresentative plaintiff does not meet the constitutional minimum," App.51.

## REASONS FOR GRANTING THE PETITION

The decision below is a trifecta of class action abuse.  It finds Article III injury for class members who concededly never had an allegedly deficient credit report shared with a third party.  It allows a radically atypical plaintiff to use his own atypical and unusually disruptive experiences to secure $8 million in statutory damages on behalf of a class consisting of individuals who concededly did not endure (and could not have endured) anything comparable.  And it sustains an additional $32 million in punitive

damages on the theory that a 4:1 ratio is constitutionally permissible even though *statutory* damages already punish and deter and this Court has indicated that a 1:1 ratio of punitives to *actual* damages approaches the constitutional limit. The ultimate result is that "TransUnion now owes 8,185 class members tens of millions of dollars based on the unfortunate and unrepresentative experience of a single plaintiff." App.58 (McKeown, J.).

That result could only occur in the Ninth Circuit, as it is fundamentally incompatible with both this Court's precedents and decisions from circuits that faithfully follow them. As the D.C. Circuit and other circuits have held, individuals who never had their information disseminated to third parties cannot claim Article III injury based on the bare fact that inaccurate information sat inchoate in a database. *See, e.g., Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339 (D.C. Cir. 2018). Nor do other circuits allow individuals to claim injury-in-fact just because they were sent a purportedly incomplete disclosure that they may not have read, let alone found confusing. *See, e.g., Flecha v. Medicredit, Inc.*, 946 F.3d 762, 768 (5th Cir. 2020). *A fortiori*, other circuits would not allow a plaintiff who *did* suffer actual injuries when a report was disseminated and credit was delayed and vacations were canceled to represent a class of thousands who suffered none of those injuries (or any others).

The consequences of allowing that misguided class to proceed were all too predictable. Hearing only of the atypical experience of the named plaintiff, the jury awarded statutory damages near the statutory

maximum and more than six times as much in
punitive damages to each and every class member.
For the truly typical member of the class — one whose
credit information never reached a third party and
who may not have even read the credit information
sent only to one's home address — the resulting ratio of
punitive damages to actual harm is nearly infinite.
Nonetheless, the Ninth Circuit trimmed back the
award only marginally, concluding that a punitive
award four times greater than a near-maximum
statutory award that already punishes and deters is
constitutionally permissible.

The combined effect of these egregiously
erroneous holdings is a roadmap to exploit atypical
plaintiffs and abuse statutory damages provisions to
secure outsized damages awards on behalf of classes
of uninjured individuals. Left unreviewed, that
roadmap will be routinely followed, to the detriment of
Article III, Rule 23, and the due process rights of any
defendant open to suit in the Ninth Circuit. The Court
should grant certiorari and bring the Ninth Circuit's
outlier jurisprudence back in line with this Court's
precedent.

## I. The Decision Below Conflicts With Cases Of This Court And Other Circuits On Basic Principles Of Article III And Rule 23.

### A. The Conclusion That Every Absent Class Member Had Article III Standing Is Wrong and Creates a Circuit Split.

1. As this Court has reiterated on numerous
occasions, a plaintiff cannot "allege a bare procedural
violation" of a statute, "divorced from any concrete
harm, and satisfy the injury-in-fact requirement of

Article III." *Spokeo*, 136 S.Ct. at 1549. Instead, a plaintiff must show that the alleged violation actually "cause[d] harm or present[ed] a[] material risk of harm" of a concrete and particularized nature. *Id.* at 1550. And if the plaintiff alleges a material risk of harm, rather than harm that has in fact come to pass, then the "threatened injury must be *certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 409.

Applying those principles, this should have been an easy case. Ramirez did not define his proposed class to include only individuals who suffered an adverse consequence after TransUnion disseminated to a potential creditor a report containing a "potential match" alert. He did not even define it to include only individuals who actually had such a report disseminated. To the contrary, he *stipulated* that no third party not a potential creditor, a potential employer, or anyone else ever even saw a credit report for more than 75% of class members. App.14-15.

Instead of focusing his class on individuals who actually suffered some adverse consequence because of the Name Screen product, Ramirez defined it based on whether, in response to a consumer's request to view his *own* credit file, TransUnion sent the consumer a mailing informing him that his name was a "potential match" to a name on the OFAC list. And even then, Ramirez did not even try to prove that any absent class member ever read that letter, let alone suffered some adverse consequence on account of the manner in which TransUnion conveyed that information.

Ramirez's ambitious effort to seek tens of millions of dollars in damages on behalf of more than 8,000 individuals should not have proceeded past the threshold. The lone thing members of his proposed class actually had in common  receipt of a letter informing them of a "potential match" and a separate letter containing the required summary of rights  could not demonstrate Article III injury absent individualized evidence. For even accepting that the absurd premise that the mailings were "inherently shocking and confusing," App.32 n.10, one cannot have been shocked by mailings one never read. And given Ramirez's failure even to try to introduce such evidence, whether any "absent class member … even opened the letter[] is pure conjecture." App.57 (McKeown, J.).

And while having an inaccurate report actually sent to a potential creditor certainly *could* hinder someone in obtaining credit, that could happen only if a report was actually disseminated to a third party which concededly did not occur *for more than 75% of the class*. Even for the minority who did have a report sent to someone, moreover, Ramirez made no effort to prove that *anyone* suffered any adverse consequence as a result. For all one knows, the potential creditor quickly dismissed the "potential match" alert after (as TransUnion instructed) cross-checking it against additional information, such as a birthdate that would make the false positive obvious. (While Ramirez's DealerTrack-produced report said "match" instead of "potential match," no one else's report lacked the "*potential*" modifier. *See* CA9.ER.215.) Simply put, there is no evidence that anyone other than Ramirez suffered any injury at all, let alone any injury

stemming from the actions that he claimed violated FCRA.

2. The Ninth Circuit nonetheless held that all 8,185 class members crossed the Article III threshold. In its view, the bare fact "that TransUnion made the reports available to numerous potential creditors and employers … is sufficient to show a material risk of harm to the concrete interests of all class members" for purposes of the reasonable-procedures claim. App.26-27. But the reports were "available" only in the sense that *every* piece of information that sits untapped in a database is "available": They *could* have been sent to a creditor or employer if but only if — contrary to fact — a creditor or employer had asked for one. Any injury to 75+% of the class thus was not just inchoate, but entirely contingent on a request that never materialized. That is patently insufficient to satisfy Article III, for even an "objectively reasonable likelihood" of harm is not enough to demonstrate the "*certainly impending*" injury that this Court's precedent demands. *Clapper*, 568 U.S. at 409-10.

The majority's holding that the mere receipt of the "potential match" mailing gave every class member standing to sue on the disclosure claims is just as obviously wrong. App.32 n.10. It is highly debatable whether Ramirez even established a FCRA violation (let alone a willful one) with respect to those mailings, as every class member received "[a]ll information in [his] file," 15 U.S.C. §1681g(a)(1), and a complete summary of his rights, *id.* §1681g(c)(2). Ramirez took issue solely with the fact that TransUnion provided that information in two contemporaneously sent envelopes instead of one, and included the summary

of rights in only one of those envelopes. Even assuming that novel theory states a FCRA violation, it is an archetypal example of the kind of technical violation that cannot be *presumed* to inflict concrete injury.

After all, the "primary purpose[]" of §1681g's disclosure requirements "is to allow consumers to identify inaccurate information in their credit files and correct [it]." *Gillespie*, 484 F.3d at 941. Article III therefore requires something more than simply receiving an inaccurate report in need of correction or getting the requisite information in two envelopes rather than one. Instead, each plaintiff must prove that the dual mailings actually impeded his efforts to "obtain the information he needed" to ensure his file is correct. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 347 (4th Cir. 2017). Ramirez did not and could not do that here. The only evidence he introduced on this issue concerned himself, and he was not impeded; he *succeeded* in contacting TransUnion and getting it to cease including an OFAC alert on future reports after receiving the mailings. CA9.ER413-16. And the evidence TransUnion introduced confirmed that the two-mailing format affirmatively *encouraged* contact with TransUnion regarding OFAC alerts. *See* CA9.ER255-56 (contact rate was lower under single-mailing format).

Instead of focusing on whether receiving the necessary information in two mailings instead of one presented a real risk of harm to the interest Congress sought to protect in §1681g, the Ninth Circuit declared the mailings so "inherently shocking and confusing" that concrete injury could be assumed. App.32 n.10.

That is doubly wrong. First, any injury on the procedural disclosure claims had to stem *from the alleged procedural violations* — *i.e.*, from the fact that all the requisite information was sent in two mailings rather than one. Shocked as an individual may be to learn that her name is a "potential match" to a name on the OFAC list, no one could seriously claim to be "shocked" that a credit-reporting agency might send that information in a separate mailing sent contemporaneously with a requested credit file, or might include a summary of her FCRA rights in only one of those two contemporaneous mailings.

Moreover, while it may be *possible* that some class members were confused by the manner in which they received the mandated disclosures, what is merely possible is not enough. "Standing is not 'an ingenious academic exercise in the conceivable.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992) (quoting *United States v. SCRAP*, 412 U.S. 669, 688 (1973)). It requires "a factual showing of perceptible harm." *Id.* Yet Ramirez introduced no evidence whatsoever that any absent class member suffered any confusion or complications as a result of receiving the two simultaneous letters. In fact, he introduced "no evidence … that a single other class member so much as opened the dual mailings." App.57 (McKeown, J.). To state the obvious, one cannot be shocked or confused by mailings one did not read.

3. Both of the Ninth Circuit's standing holdings are flatly contrary not only to this Court's precedent, but to decisions of its sister circuits, as Judge McKeown noted in dissent. The D.C. Circuit's decision in *Owner-Operator Independent Drivers* is illustrative.

24

There, the plaintiffs were "commercial truck drivers" who "claim[ed] they were injured by the Department of Transportation's violation of its statutory obligation to ensure the accuracy of a database containing driver-safety information." 879 F.3d at 340. While "nothing in the record indicate[d]" that any third party "accessed," let alone "used," the allegedly inaccurate information housed in the database, the plaintiffs argued that the information "could easily harm a [plaintiff] were it shared with prospective employers." *Id.* at 343, 347. The court held that even if the database contained inaccurate information about the plaintiffs, they still "suffered no concrete injury in fact sufficient to confer Article III standing" "because dissemination" of their information was "not imminent." *Id.* at 347. In reaching that conclusion, the court explained that it could find "no historical or common-law" support for the notion that "the mere existence of inaccurate information, absent dissemination, amounts to concrete injury." *Id.* at 344-45.

The D.C. Circuit is not alone in reaching that conclusion. Both the Seventh and the Eighth Circuits likewise have found the mere risk that customer data retained in violation of a federal statute might be disseminated insufficient to confer standing. *See, e.g.*, *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 910-11 (7th Cir. 2017); *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930-31 (8th Cir. 2016).

Other circuits have been equally unreceptive to claims that the mere receipt of an allegedly deficient disclosure is enough to satisfy Article III. The Fifth Circuit recently rejected the proposition that mere

receipt of an incomplete FCRA disclosure gives rise to Article III injury, noting that "unnamed class members … who received the letter, but ignored it as junk mail or otherwise gave it no meaningful attention," would plainly "lack a cognizable injury under Article III." *Flecha*, 946 F.3d at 768. The Seventh Circuit rejected a plaintiff's effort to sue on behalf of everyone who received a deficient FCRA disclosure when he presented no evidence "plausibly suggesting that he" (or anyone else) "was confused by the disclosure." *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 889 (7th Cir. 2017). The Fourth Circuit rejected an effort to sue on behalf of every consumer who received a report containing certain inaccurate information when there was no evidence that this alleged FCRA violation had any impact on anyone. *Dreher*, 856 F.3d at 342, 345. And the Sixth Circuit rejected a FCRA claim premised on mere receipt of allegedly deficient information when the plaintiff conceded that receipt of the "incomplete report did not 'have any effect on [him] whatsoever.'" *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 463 (6th Cir. 2019).

In short, it is "pure conjecture" "whether any … class member" here *in fact* "suffered the adverse consequences that befell Ramirez, or even opened the letter." App.57 (McKeown, J.). In any other circuit, that would have precluded Ramirez from seeking millions of dollars on behalf of 8,184 absent class members as those circuits heed this Court's repeated admonishment that "[c]onjecture based on an unrepresentative plaintiff does not meet the constitutional minimum." App.51 (McKeown, J.); *see, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499

(2009). The Ninth Circuit's contrary decision is "*SCRAP* for a new generation" of absent class members. *Massachusetts v. EPA*, 549 U.S. 497, 548 (2007) (Roberts, C.J., dissenting).

### B. The Conclusion That Ramirez Was Typical of the Class Defied Reality as Well as This Court's Rule 23 Precedents.

Even assuming the absent class members crossed the Article III threshold, Ramirez's unique experiences and actual injuries still should have precluded class certification, as they made him radically atypical of the class he sought to represent. To satisfy the typicality requirement, "a class representative must … [have] suffer[ed] the same injury as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011); *see* Fed. R. Civ. P. 23(a)(3). The Ninth Circuit elided that requirement by conflating Article III and Rule 23. Whether or not the mere receipt of two contemporaneous mailings instead of one or the mere existence of potentially inaccurate reports "exposed every class member to a material risk of harm" sufficient for Article III, App.31-33, an individual who was *actually* injured is simply not typical of a class of individuals who did not suffer anything like the same injuries.

Here, Ramirez *stipulated* that he was radically atypical of more than 75% of the class, and he made no effort to limit his proof to experiences common to the entire class or to prove "that a single other class member" shared his experiences. App.57 (McKeown, J.). There is no evidence that anyone other than Ramirez was hindered in an effort to obtain credit (let alone hindered at a retail outlet in front of family

members) or that anyone other than Ramirez canceled travel plans on account of concerns over the OFAC alert. There is no evidence that anyone else even read the two mailings, let alone was confounded by their duality or "spent significant time and energy trying to remove the alert." App.39. Yet the Ninth Circuit nonetheless concluded that "the unique aspects of Ramirez's claims" were not so "significant … that they 'threaten[ed] to become the focus of the litigation.'" App.40.

That conclusion blinks reality. One need not speculate there *was* a trial here, and it *in fact* "focused on Ramirez and his unique circumstances" to the exclusion of any "story of the absent class members." App.51, 53 (McKeown. J.). Of course it did. Any rational class counsel would rather tell the story of a plaintiff who was impeded in his efforts to obtain credit while his wife and father-in-law looked on than talk about the typical experience of a class member whose credit report was never even seen by a third party. Concrete examples of credit denied, embarrassment suffered, and vacations canceled are far more likely to generate statutory damages near the maximum (and punitive damages to boot) than less dramatic but far more typical stories of two letters rather than one received at a home mailing address. That is presumably why counsel implored the jury to look at "what happened to Mr. Ramirez," not anyone else, in assessing damages. CA9.ER257-58.

In other circuits, a class of plaintiffs subject to a procedural shortcoming without any accompanying concrete injury would have been stymied at the outset by the lack of standing. *See supra* pp.23-25. But even

assuming that some absent class members crossed the Article III threshold, they could not be properly represented by a named plaintiff who suffered far greater and much different injuries any more than individuals who suffered only superficial injuries could be represented by a named plaintiff who suffered dismemberment. Rule 23 and its typicality requirement prevent such unrepresentative and fundamentally unfair class proceedings. *See* App.53-54 (McKeown, J.).

## II. The Ninth Circuit's Punitive Damages Analysis Defies Due Process And This Court's Cases.

It is remarkable enough that the Ninth Circuit allowed Ramirez to sue on behalf of 8,184 uninjured class members. That the court affirmed more than *$40 million* in statutory and punitive damages is extraordinary. As this Court has made clear, "[w]hen compensatory damages are substantial," a punitive damages award "perhaps only equal to compensatory damages[] … reach[es] the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. The Ninth Circuit readily acknowledged that "$8 million in statutory damages is quite substantial." App.47. Indeed, while "the touchstone" for reviewing punitive damages awards is the total "class recovery," not each "individual award," *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 515 n.28 (2008), an award of $984.22 per person for hyper-technical FCRA violations that most of the class probably did not even know occurred is substantial by any measure.

That alone should have provided sufficient basis to limit the punitive damages award to (at most) $8

million, *i.e.*, equal to the underlying damages award. But the nature of the underlying damages award here makes the constitutional concerns with far larger punitive damages awards all the more acute. The underlying damages award that the Ninth Circuit used as the basis for its 4:1 ratio does not represent compensatory damages (and thus the jury's assessment of actual harm). Ramirez did not even *seek* compensatory damages on behalf of the class (presumably because such damages are plaintiff-specific and most suffered no actual injury at all). Ramirez instead sought a classwide award of *statutory* damages and received an award just shy of FCRA's $1,000 statutory maximum. *See* 15 U.S.C. §1681n(a). The $8 million award here thus was not a measure of "the actual ... harm suffered by the plaintiff[s]," *State Farm*, 538 U.S. at 418, but was instead itself intended (as statutory damages permissibly may be) to punish and deter. *See St. Louis, I. M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001). That is clear from the record, for Ramirez not only introduced *no evidence* that any absent class member suffered any compensable injury, but openly implored the jury to award the highest end of the statutory range to impose the "maximum penalty" on TransUnion. CA9.ER258.

That makes this a particularly obvious case for application of the rule that a punitive damages award "equal to" the jury's underlying award "reach[es] the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. After all, because punitive damages awards and statutory damages are both designed to punish and deter, there is a very real risk that awarding punitive damages on top of statutory

damages constitutes unconstitutionally duplicative punishment. Indeed, it is far from clear that even a 1:1 ratio would satisfy due process when the second number is not a measure of "the actual … harm suffered by the plaintiffs." *State Farm*, 538 U.S. at 418. Put differently, the jury's statutory damages award is not even a good proxy for the actual damages suffered by a typical class member, and the true ratio of punitive damages to actual harm in this case approaches infinity and far exceeds constitutional bounds.

The Ninth Circuit nonetheless reduced an award it recognized as unconstitutional only to a 4:1 ratio, without even so much as acknowledging the need to account for the statutory damages nature of the base amount or the double recovery concerns that TransUnion repeatedly highlighted. Instead, the majority proceeded as if this Court had declared 4:1 the constitutional floor, and simply edited out of its description of *State Farm* the Court's admonition that due process may allow no more than an award *"equal to compensatory damages"* when, as here, the underlying award is "substantial." 538 U.S. at 425 (emphasis added). *See* App.47.

That blasé approach to massive damages awards is irreconcilable both with this Court's cases and with cases from other circuits faithfully applying them. Other circuits have not hesitated to find much lower awards sufficiently "substantial" to demand a 1:1 ceiling even without the duplicative punishment problem that arises from a statutory damages award. *See, e.g.*, *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1075 (10th Cir. 2016) (finding 1:1 ratio "the

appropriate limit of due process" given "substantial compensatory damages [of] almost $1 million"); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 799 (8th Cir. 2004) (reducing punitive damages to 1:1 ratio given $600,000 compensatory damages award "a lot of money"). *A fortiori*, a multimillion-dollar statutory award like this one could never justify a 4:1 punitive damages award in those circuits.

This case thus provides the Court with an ideal opportunity to reinforce that 1:1 is indeed the ceiling for the vast majority of punitive damages cases in which the jury has already issued a substantial award. It also provides the Court with an ideal opportunity to make clear that the ratio analysis in a statutory damages case must focus on "the actual … harm suffered by the plaintiff[s]," *State Farm*, 538 U.S. at 418, not simply on the base number of a statutory damages award that may already reflect a substantial degree of punishment and deterrence.

## III. The Questions Presented Are Exceptionally Important.

The Ninth Circuit's trifecta of untenable rulings will reverberate well beyond this case and well beyond the FCRA context. The class action was designed to be "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart*, 564 U.S. at 349 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)); *see also, e.g.*, *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Yet, in many jurisdictions (particularly the Ninth Circuit), it has become the rule rather than the exception. Indeed, one recent study found that 60% of major U.S.

companies were embroiled in federal class action litigation in 2017. *See The 2018 Carlton Fields Class Action Survey* 6 (2018), https://bit.ly/2WBMs17.

That alone is reason to carefully scrutinize any decision that makes it substantially easier to bring class actions, as "[c]ertification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978), *superseded on other grounds by rule as stated in Microsoft Corp. v. Baker*, 137 S.Ct. 1702 (2017). And that concern is amplified when the cause of action permits recovery of punitive damages, for "the risk of suffering a crushing punitive damages penalty" on its own often "gives rise to so-called 'blackmail settlements' in which defendants pay more than the … claims are reasonably worth." James A. Henderson, Jr., *The Impropriety of Punitive Damages in Mass Torts*, 52 Ga. L. Rev. 719, 747 (2018).

But all of those concerns are even more acute when it comes to class actions under statutes like FCRA that allow for statutory damages as well as punitive damages. To be sure, statutory damages can be an important and effective tool for dealing with unlawful conduct that causes injuries that may be difficult to quantify. *See, e.g., Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348-55 (1998) (describing history of statutory damages for copyright infringement). But they also have the potential for massive abuse, particularly when combined with the class action device and punitive damages awards. *See, e.g., Parker v. Time Warner Ent. Co.*, 331 F.3d 13, 22

(2d Cir. 2003) (noting due process concerns that "arise from the effects of combining a statutory scheme that imposes minimum statutory damages awards on a per-consumer basis … with the class action mechanism that aggregates many claims."). That concern with the combined effect of statutory damages, punitive damages, and class actions is particularly acute because the availability of statutory damages often obviates the need to prove compensatory damages, which tend to be individualized and thus less suited to class treatment. Without proof of compensatory damages, there is no reliable indicator of actual harm to facilitate meaningful due process review of any resulting punitive damages award. This case well illustrates the problem, as a plaintiff who suffered actual compensatory damages eschewed proving them in favor of pursuing statutory and punitive damages on behalf of the class.

All of that makes it particularly critical for this Court to be vigilant about enforcing Article III, Rule 23, and due process principles in this context. It is one thing to offer an individual plaintiff the option of accepting a small measure of damages without proving up the precise dollars-and-cents impact of her injuries. It is another thing to offer a plaintiff the option of recovering such damages on behalf of a class of individuals for alleged legal violations that cause little or no tangible harm. *See Spokeo*, 136 S.Ct. at 1549-50. It is yet another thing altogether to allow that classwide award of statutory damages, which are themselves designed to punish and deter without necessarily reflecting the amount of actual harm to

the class, to be the justification for awarding four times as much in punitive damages.

The decision below permits all of that in a case that would be thrown out at the jurisdictional threshold in most circuits. The combined effect of its rulings on Article III, Rule 23, and punitive damages provides a roadmap that, if left unreviewed, will be followed by countless class action lawyers in the Ninth Circuit. The process of identifying a particularly sympathetic named plaintiff, forgoing proving up her actual damages in lieu of a demand for substantial statutory and punitive damages, and defending the resulting punitive damages award as merely a multiple of statutory damages is neither difficult to replicate nor limited to FCRA. Numerous federal statutes allow for punitive damages on top of statutory damages. *See, e.g.*, 12 U.S.C. §3417(a) (authorizing $100-per-violation "statutory damages" plus "actual damages" as well as "punitive damages"); 18 U.S.C. §248(c)(1) (authorizing "compensatory" or "statutory damages," plus "punitive damages"); 18 U.S.C. §2520 (authorizing "actual" or "statutory damages," plus "punitive damages"). And as this Court recently recognized, damages "can add up quickly in a class action" when statutory damages are available. *See Barr v. Am. Ass'n of Pol. Consultants*, 140 S.Ct. 2335, 2345 (2020) (plurality op.). Those concerns are particularly acute with FCRA, which does not cap a defendant's liability in class actions. *Compare, e.g.*, 15 U.S.C. §1640(a)(2)(B), *and id.* §1692k(a)(2)(B), *with id.* §1681n (FCRA). That makes the need for this Court's review all the more pressing.

In short, the decision below manages to eviscerate Article III, Rule 23, and due process constraints on statutory damages class actions all at once, leaving no meaningful check on abuse of the many federal statutes that authorize recovery of statutory damages. In the process, it reaffirms the Ninth Circuit's status as an outlier on both standing and class actions, as well as the need for this Court's intervention. This is an ideal case in which to consider the questions presented, as it is the rare class action that was litigated to final judgment, with every question pressed and passed upon in both courts below. The Court should grant certiorari and ensure that the decision below does not become a roadmap for abuse of statutory damages provisions, the class action device, and the federal courts.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition.

Respectfully submitted,

JULIA B. STRICKLAND          PAUL D. CLEMENT
STEPHEN J. NEWMAN             *Counsel of Record*
CHRISTINE E. ELLICE          ERIN E. MURPHY
STROOK & STROOK              MATTHEW D. ROWEN
  & LAVIN LLP           KIRKLAND & ELLIS LLP
2029 Century Park E.         1301 Pennsylvania Ave., NW
Los Angeles, CA 90067        Washington, DC 20004
                             (202) 389-5000
                             paul.clement@kirkland.com

*Counsel for Petitioner*

September 2, 2020

# EXHIBIT 2

JS 44 AND  (Rev. 12/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Sergio L. Ramirez

**DEFENDANTS**
Trans Union, LLC

**(b)** County of Residence of First Listed Plaintiff    Alameda
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Pennsylvania
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE·    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*
Andrew J. Ogilvie, Esq.    (415) 651-1952
Anderson, Ogilvie & Brewer, LLP
600 California St., 18th Floor, San Francisco, CA  94108

Attorneys *(If Known)*

12-632
JSC

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
       Plaintiff

☒ 3 Federal Question
       *(U.S. Government Not a Party)*

☐ 2  U.S. Government
       Defendant

☐ 4 Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)*  and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | of Property 21 USC 881 | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | ☐ 690 Other | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 480 Consumer Credit |
| (Excl. Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | Leave Act | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 790 Other Labor Litigation | | Act |
| | Med. Malpractice | | ☐ 791 Empl. Ret. Inc. | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | Security Act | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | Sentence | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | ☐ 530 General | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | |
| | Other | ☐ 560 Civil Detainee - | (Prisoner Petition) | | |
| | ☐ 448 Education | Conditions of | ☐ 465 Other Immigration | | |
| | | Confinement | Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
      Proceeding

☐ 2 Removed from
      State Court

☐ 3 Remanded from
      Appellate Court

☐ 4 Reinstated or
      Reopened

☐ 5 Transferred from
      another district
      *(specify)*

☐ 6 Multidistrict
      Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
Fair Credit Reporting Act, 15 U.S.C. §§ 1681, et seq., et al.
Brief description of cause:

## VII. REQUESTED IN
COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY
*(See instructions):*
JUDGE  Claudia Wilken

DOCKET NUMBER  11-cv-0180 CW

## IX. DIVISIONAL ASSIGNMENT (Civil L.R. 3-2)
*(Place an "X" in One Box Only)*

☒ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE   ☐ EUREKA

DATE  02/09/2012

SIGNATURE OF ATTORNEY OF RECORD

1   Andrew J. Ogilvie       SBN 57932
        andy@aoblawyers.com
2   Carol McLean Brewer     SBN 214035
        carol@aoblawyers.com
3   ANDERSON, OGILVIE & BREWER, LLP
4   600 California Street, 18th Floor
    San Francisco, CA  94108
5       Telephone:  (415) 651-1952
6       Facsimile:  (415) 956-3233

7   James A. Francis  (pro hac vice application to be submitted)
        Jfrancis@consumerlawfirm.com
8   John Soumilas    (pro hac vice application to be submitted)
        JohnSoumilas@consumerlawfirm.com
9
    FRANCIS & MAILMAN, P.C.
10  Land Title Building, 19th Floor
11  100 South Broad Street
    Philadelphia, PA  19110
12      Telephone:  (215) 735-8600
13      Facsimile:  (215) 940-8000

14  Attorneys for Plaintiff, Sergio L. Ramirez

15                      UNITED STATES DISTRICT COURT

16                      NORTHERN DISTRICT OF CALIFORNIA
17

18  SERGIO L. RAMIREZ, on behalf of         )  Case No. 12   0632
    himself and all others similarly situated, )
19                                           )
                                             )  CLASS ACTION
20          Plaintiffs,                      )
                                             )
21      v.                                   )      COMPLAINT
                                             )
22  TRANS UNION, LLC,                        )  DEMAND FOR JURY TRIAL
                                             )
23          Defendant.                       )

24

25                      **PRELIMINARY STATEMENT**

26      1.      This is a consumer class action based upon the widespread violations by

27  defendant Trans Union, LLC ("Trans Union" or "Defendant") of the Fair Credit Reporting

28  Act, 15 U.S.C. §§ 1681 – 1681x ("FCRA").  Trans Union is regulated as a consumer

reporting agency ("CRA") under the FCRA. Trans Union is also regulated as a consumer credit reporting agency ("CCRA") under the California Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code §§ 1785.1 – 1787.3. The rights of consumers to inspect and correct consumer information sold about them are at the heart of the FCRA and the CCRAA. Trans Union deprives consumers of these rights by willfully failing to comply with the FCRA and the CCRAA and refusing to follow their requirements and provide consumers with all information it sells about them to third parties, specifically, information about whether a given consumer is reported as purportedly included in the Office of Foreign Assets Control, Specifically Designated National and Blocked Persons ("OFAC") list. As a result, Trans Union deprives consumers of rights afforded to them by the FCRA and the CCRAA to obtain a copy of and review the information that Trans Union sells about them, to dispute and to have corrected any inaccurate or incomplete information that Trans Union is reporting, and to require that Trans Union maintain reasonable procedures to assure the maximum possible accuracy of that information before it sells it to any third party in a consumer report.

## JURISDICTION AND VENUE

2.     Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331 and supplemental jurisdiction exists for the state law claims under 28 U.S.C. § 1367.

3.     Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4.     Plaintiff Sergio L. Ramirez is an adult individual who resides in Fremont, California.

5.     Defendant Trans Union, LLC is a consumer reporting agency that regularly conducts business in the Northern District of California and which has a principal place of business located at 1510 Chester Pike, Crum Lynne, PA 19022.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FACTUAL ALLEGATIONS

A.    **Trans Union Fails To Provide Consumers With All Information In Their Files, And Fails To Report Consumer Information Accurately**

6.    Defendant is one of the "big three" credit reporting agencies (singular "CRA") in the U.S.

7.    Defendant sells consumer reports (commonly called "credit reports") about millions of consumers annually.

8.    Defendant is regulated by the FCRA and its state analogue the CCRAA.

9.    The FCRA is intended "to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010).

10.    In furtherance of that goal, the FCRA mandates that each CRA provide consumers with access to the information sold about them to third parties and also provide consumers with an opportunity to review and dispute any inaccuracies in their credit files. *See* 15 U.S.C. §§ 1681g(a) and 1681i(a).

11.    Specifically, each CRA is required by the FCRA to provide consumers with copies of their consumer files without charge every twelve months, after a credit denial and in other limited circumstances. *See* 15 U.S.C. § 1681g(a).

12.    The term "file," when used in connection with information on any consumer, means "***all*** of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored." *See* 15 U.S.C. § 1681a(g) (emphasis added).

13.    "Congress clearly intended the protections of the FCRA to apply to all information furnished or that might be furnished in a consumer report" and an FCRA " 'file' denotes all information on the consumer that is recorded and retained by a consumer reporting agency that might be furnished, or has been furnished, in a consumer report on

3

that consumer." *Cortez*, 617 F.3d at 711-12 (*citing Gillespie v. Trans Union Corp.*, 482 F.3d 907, 909 (7th Cir. 2007)).

14.     After obtaining and reviewing a copy of their files, consumers have the right to dispute any inaccurate information in their credit files, and to have errors corrected by the CRA, usually within 30 days of their disputes. *See* 15 U.S.C. § 1681i(a).

15.     In a seminal decision against Trans Union, the United States Court of Appeals for the Third Circuit held that "OFAC alerts" are part of a consumer's credit file and must be included in a file disclosure provided to the consumer.  "We hold that information relating to the OFAC alert is part of the consumer's 'file' as defined in the FCRA." *Cortez*, 617 F.3d at 712.

16.     An OFAC alert is a specific type of data provided by consumer reporting agencies on credit reports signifying that the subject of the report is purportedly included in the list of the Office of Foreign Assets Control, Specifically Designated National and Blocked Persons, which includes terrorists, money launderers and narcotics traffickers.

17.     In *Cortez*, Trans Union argued that an OFAC alert is not part of its file on the consumer.

18.     Trans Union also argued in *Cortez* that it does not need to reinvestigate or correct an erroneous OFAC alert that it has placed on in a consumer's file.

19.     Trans Union also argued in *Cortez* that it is not required to disclose an OFAC alert in a consumer's file when that consumer asks for a disclosure of the contents of his/her file.

20.     In *Cortez*, the Court of Appeal rejected Trans Union's argument that an OFAC alert is not part of its file on the consumer.

21.     In *Cortez*, the Court of Appeal also rejected Trans Union's it does not need to reinvestigate or correct an erroneous OFAC alert that it has placed on in a consumer's file.

4

22.   In *Cortez*, the Court of Appeal also rejected Trans Union's argument that it does not have to disclose an OFAC alert in a consumer's file when that consumer asks for a disclosure of the contents of his/her file at Trans Union.

23.   The United States Court of Appeals in *Cortez* held that Trans Union was liable for failing to disclose OFAC alerts in consumer files and for failing to reinvestigate and correct an OFAC alert erroneously attributed by Trans Union to the wrong consumer. *Id.* at 712-13.

24.   Nonetheless, despite this clear Third Circuit precedent directed to the same Defendant, Trans Union continues to compile and sell reports about consumers that include OFAC alerts, without including the same OFAC alerts in the consumer file disclosures Defendant provides to those same consumers.

25.   Defendant further misinforms consumers about their right to dispute such inaccurate OFAC alert information and have it corrected pursuant to the FCRA, and in fact fails to reinvestigate and correct such errors.

26.   At all times relevant to this action, Defendant, as a matter of its normal course and practice, and despite the Third Circuit's decision in *Cortez*, fails to include the OFAC alerts that it reports about consumers to third parties in the consumer's own files which consumers, as of right, may request and obtain from the Defendant.

27.   Also as a matter of common practice, Defendant does not advise consumers that they may dispute inaccurate OFAC alerts, and thus does not reinvestigate such disputes or correct such errors.

28.   Defendant also fails to maintain reasonable procedures to assure the maximum possible accuracy of the OFAC alert information it sells about consumers in the first place. *See* 15 U.S.C. § 1681e(b).

29.   One of the most well known and prevalent inaccuracies that occurs in Trans Union's consumer files is a "mixed file."

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30.     A mixed file is a consumer report in which some or all of the information in the report pertains to a person other than the person who is the subject of the report.

31.     Defendant has known since entering into a Consent Order agreeing to correct the mixed file problem on October 26, 1992, in *The State of Alabama, et al. v. Trans Union Corp.*, 92-C-7101 (N.D. Ill.), that it has a widespread problem of reporting one consumer's information in the credit report of another.

32.     In the above-referenced litigation brought by the Attorneys General of seventeen states, Defendant agreed to take affirmative action to remedy the "mixed file" problem, specifically by using "full identifying information" to properly identify each individual consumer.

33.     Indeed, the main cause of the mixed file problem is Defendant's failure to use full identifying information to match credit records on its database to the information of consumers actually applying for credit, insurance or employment.

34.     In *The State of Alabama, et al. v. Trans Union Corp.*, 92-C-7101 (N.D. Ill.), Defendant agreed to collect and use "full last name and first name; middle initial; full street address; zip code; year of birth; any generational designation; and social security number" in preparing any report about any given consumer. *Id.* at ¶ F(8) (emphasis added).

35.     Despite those representations by Defendant, to date more than a hundred thousand possible mixed files are known to occur every year in Defendant's credit reporting databases.

36.     Despite those representations by Defendant, to date Defendant's common practice is to use only partial matching, and not full identifying information, in preparing consumer credit reports.

37.     Indeed, Defendant's practice is to prepare and sell a consumer credit report using only the name and address of the consumer purportedly applying for credit.

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

38.    Defendant's practice is not to require a match to "full last name and first name; middle initial; full street address; zip code; year of birth; any generational designation; and social security number" before preparing a report that it will attribute to a particular consumer and sell about that same particular consumer.

39.    OFAC alert information, as part of the consumer's file and report, is also subject to the maximum possible accuracy standard, as the Third Circuit has specifically advised Trans Union: "OFAC information included in a consumer report and sold about a consumer falls within the purview of the FCRA, and the 'maximum possible accuracy standard.'  Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here." *Cortez*, 617 F.3d at 710.

40.    In *Cortez*, Defendant had mixed the plaintiff in the case with the OFAC records of a person with a similar, but not identical name, who was some twenty years younger than that plaintiff.

41.    Despite the abundant notice it has regarding the unlawfulness of its practices, Defendant continues to use a "name only" match in determining whether a given consumer will be reported on his/her Trans Union consumer credit report as an alleged criminal on the OFAC list.

42.    Moreover, not even the name only match needs to be an exact match between the actual name of the alleged criminal on the OFAC list and the actual name of the innocent consumer applying for credit.

43.    Thus, Defendant will place an OFAC alert on a consumer's report based solely on a partial name match.

7

44.     Defendant continues to employ policies and procedures which frequently allow the information belonging to one consumer to appear in the credit file of another.

45.     Defendant does so because Defendant always seeks to have some credit information available for sale to its customers (accurate or not), in order to maximize its profits.  Defendant thus intentionally employs procedures that maximize the likelihood of match between any credit inquiry and some data in its database about one or more consumers.  Defendant thus intentionally compromises accuracy in its efforts to increase sales.

46.     Defendant's reporting of OFAC alert information is not accidental, nor a result of simply negligence, but instead a result of deliberately designed policies and procedures.

**B.      The Experience Of The Representative Plaintiff**

47.     Plaintiff is but one consumer about whom Defendant sold inaccurate OFAC information which it did not disclose on his file.

48.     On or about February 27, 2011, Plaintiff applied for an automobile loan at Dublin Nissan.

49.     On or about February 27, 2011, Dublin Nissan ordered a Trans Union consumer report for Plaintiff, after obtaining the Plaintiff's name, address, social security number and date of birth, which Plaintiff provided as part of his credit application, and which Dublin Nissan transmitted to Defendant in seeking a credit report about Plaintiff.

50.     Defendant sold Dublin Nissan a Trans Union consumer report purportedly about Plaintiff on the same day for a fee.

51.     Despite having been provided with Plaintiff's name, address, social security number and date of birth, Defendant used a partial "name only" match in determining whether Plaintiff was on the OFAC list.

52.     Plaintiff was advised by representatives at Dublin Nissan after they reviewed his Trans Union consumer report that it refused to extend him credit since there

8

was an "OFAC alert" on his credit report.   Plaintiff understood this to mean that he had been identified as a terrorist.

53.     Representatives from Dublin Nissan showed Plaintiff a copy of the Trans Union consumer report they reviewed in making their credit determination and it included the names of two unknown and unrelated individuals, "Sergio Humberto Ramirez Aguirre" ("Aguirre') and "Sergio Alberto Cedula Ramirez Rivera" ("Rivera"), both of whom appear on the United States Department of the Treasury OFAC list of specially designated nationals and blocked persons.

54.     Contrary to the information contained in the Trans Union report prepared for and sold to Dublin Nissan, Plaintiff Ramirez is not an individual included on the OFAC list, and is not related to either Aguirre or Rivera.

55.     Dublin Nissan refused to extend credit to Mr. Ramirez, since businesses in the United States are generally prohibited from dealing with anyone listed on OFAC's specially designated national and blocked persons list. *See e.g.*, 31 C.F.R. § 536.201.

56.     Shocked and embarrassed, Mr. Ramirez promptly called Trans Union to dispute Trans Union's erroneous reporting of his purported inclusion on the OFAC list.

57.     Plaintiff was falsely informed by Trans Union representatives that there was no OFAC alert included in his consumer file, and that there was no way for him to make a dispute for information that did not appear in his file.

58.     Mr. Ramirez called Trans Union specifically to dispute the OFAC alert included in the consumer report sold about him by Trans Union, but once Trans Union representatives told him he could not dispute OFAC alert, he asked that Trans Union send him a copy of his file so that he could verify that there was no OFAC alert being reported about him.

59.     Trans Union's representatives told Plaintiff that the OFAC alert would not be included in his credit file when sent to him.

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

60.     Plaintiff thereafter received a Trans Union file disclosure, dated February 28, 2011 and mailed to Plaintiff from Defendant's consumer relations center in Chester, Pennsylvania.

61.     The February 28, 2011 file disclosure included Plaintiff's personal identifying information, his account information, information about inquiries for his credit, including the credit inquiry by Dublin Nissan.

62.     Plaintiff's February 28, 2011 consumer file disclosure, however, did not include any OFAC alert or information whatsoever, and thus was not a complete and proper file disclosure as required by FCRA section 1681g(a).

63.     Upon information and belief, neither Plaintiff nor any of the Class members as set forth below were provided upon request with consumer file disclosures which included the false OFAC alert that the Defendant was reporting about them to third parties.

64.     As a result of Defendant's failure to provide Plaintiff with all of the information it maintains and/or sells about him, specifically the OFAC alert information, Plaintiff was misled concerning the information that Defendant was reporting about him to third parties and deprived of the opportunity to dispute and correct the inaccurate OFAC alert that Defendant inaccurately associated with him on his report.

65.     Several days later, under separate cover, Plaintiff received a letter from Defendant's Woodlyn, Pennsylvania facility dated March 1, 2011, "Regarding: OFAC (Office of Foreign Assets Control) Database" (the "March 1, 2011 correspondence").

66.     Upon information and belief, Defendant sends this form correspondence only to those consumers, like Plaintiff, who have contacted Defendant about its erroneous reporting of an OFAC alert on their reports, but not to all persons about whom Defendant has sold any report that included an OFAC alert.

67.     The March 1, 2011 correspondence sent to Plaintiff Sergio L. Ramirez, born in 1976, stated: "[t]he OFAC record that is considered a potential match to the name on

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

your credit file is. . .  Ramirez Aguirre, Sergio Humberto, Tijuana Mexico, date of birth, XX/XX/1951; and Ramirez Rivera, Sergio Alberto Cedula, Cali Columbia, date of birth, XX/XX/1964."

68.     The March 1, 2011 correspondence does not constitute a proper consumer file disclosure as defined in the FCRA, 15 U.S.C. §§ 1681a(g) and 1681g.

69.     The March 1, 2011 correspondence is a standardized form letter, which is customized with the subject consumer's name and address and which includes the purportedly matching OFAC alert information, but no other public records or credit information relating to that consumer.

70.     The March 1, 2011 correspondence contained no summary of rights prepared by the Commission, as required by FCRA § 1681g(c)(2)(A) and CCRAA § 1785.15(f).

71.     The March 1, 2011 correspondence contained no toll-free telephone number established by the CRA, at which personnel are accessible to consumers during normal business hours, as required by FCRA § 1681g(c)(2)(B) and CCRAA § 1785.15(f).

72.     The March 1, 2011 correspondence contained no list of all Federal agencies responsible for enforcing any provision of the FCRA, nor the address and any appropriate phone number of each such agency, as required by FCRA § 1681g(c)(2)(C) and CCRAA § 1785.15(f).

73.     The March 1, 2011 correspondence contained no statement that the consumer may have additional rights under state law, and that the consumer may wish to contact a state or local consumer protection agency or a state attorney general (or the equivalent thereof) to learn of those rights, as required by FCRA § 1681g(c)(2)(D) and CCRAA § 1785.15(f).

74.     The March 1, 2011 correspondence contained no statement concerning the right of a consumer to dispute information in the file of the consumer under section 1681i of this title, as required by 15 U.S.C. § 1681g(c)(1)(B)(iii) and CCRAA § 1785.15(f).

75.     The March 1, 2011 correspondence provides no instructions or methods by which Plaintiff may dispute or request that Trans Union stop selling reports about him with any OFAC alert or information on them.

76.     As of result of Defendant's conduct, Plaintiff has suffered damages in the form of (a) lost credit opportunity, (b) harm to reputation, and (c) emotional distress.

77.     At all times pertinent hereto, Defendant was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

78.     At all times pertinent hereto, the conduct of the Defendant, as well as that of its agents, servants and/or employees, was malicious, intentional, willful, reckless, and in grossly negligent disregard for federal laws and the rights of the Plaintiff herein.

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action on behalf of the following Classes:

(a) **For Defendant's violations of FCRA § 1681g(a)**:  All persons residing in the United States and its Territories who during the period beginning two (2) years prior to the filing of this Complaint and continuing through the date of the resolution of this case had a consumer report sold about them by Trans Union, which included any OFAC record, and to whom Trans Union subsequently sent a file disclosure substantially similar in form to the February 28, 2011 file disclosure from Defendant to Plaintiff, excluding Sergio Humberto Ramirez Aguirre and Sergio Alberto Cedula Ramirez Rivera.

(b) **For Defendant's violations of CCRAA § 1785.10:**  All persons residing in the State of California who during the period beginning two (2) years prior to the filing of this Complaint and

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

continuing through the date of the resolution of this case had a consumer report sold about them by Trans Union, which included any OFAC record, and to whom Trans Union subsequently sent a file disclosure substantially similar in form to the February 28, 2011 file disclosure from Defendant to Plaintiff, excluding Sergio Humberto Ramirez Aguirre and Sergio Alberto Cedula Ramirez Rivera.

80.     Plaintiff also brings this action on behalf of the following Classes:

(a) **For Defendant's violations of FCRA §§ 1681g(a) & (c):** All persons residing in the United States and its Territories to whom, during the period beginning two (2) years prior to the filing of this Complaint and continuing through the date of the resolution of this case, Trans Union sent a letter substantially similar in form to the March 1, 2011 correspondence from Defendant to Plaintiff.

(b) **For Defendant's violations of CCRAA §§ 1785.10 & 1785.15(f):** All persons residing in the State of California to whom, during the period beginning two (2) years prior to the filing of this Complaint and continuing through the date of the resolution of this case, Trans Union sent a letter substantially similar in form to the March 1, 2011 correspondence from Defendant to Plaintiff.

81.     Plaintiff also brings this action on behalf of the following Classes:

(a) **For Defendant's violations of FCRA § 1681e(b):** All persons residing in the United States and its Territories with the first name "Sergio" and the last name "Ramirez" who, during the period beginning two (2) years prior to the filing of this Complaint and continuing through the date of the resolution of this case, had a

13

1

2

3

4

5

6

7

8

9

10

11

consumer report sold about them by Trans Union which included an OFAC record, excluding Sergio Humberto Ramirez Aguirre and Sergio Alberto Cedula Ramirez Rivera.

(b) **For Defendant's violations of CCRAA § 1785.14(b):** All persons residing in the State of California with the first name "Sergio" and the last name "Ramirez" who, during the period beginning two (2) years prior to the filing of this Complaint and continuing through the date of the resolution of this case, had a consumer report sold about them by Trans Union which included an OFAC record, excluding Sergio Humberto Ramirez Aguirre and Sergio Alberto Cedula Ramirez Rivera.

12

13

14

82.     The Classes are so numerous that joinder of all members is impracticable. Although the precise number of Class members is known only to Defendant, Plaintiff avers upon information and belief that the Classes number in the thousands.

15

16

17

18

19

20

21

83.     There are questions of law and fact common to the Classes that predominate over any questions affecting only individual Class members.   The principal questions concern whether the Defendant willfully and/or negligently violated the FCRA and/or the CCRAA by failing to provide consumers with access to all information contained in their consumer files, as well as whether the Defendant follows reasonable procedures to assure the maximum possible accuracy of the information contained in consumers' files with respect to OFAC information.

22

23

84.     Plaintiff's claims are typical of the claims of the Classes, which all arise from the same operative facts and are based on the same legal theories.

24

25

26

27

85.     Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff is committed to vigorously litigating this matter.   Further, Plaintiff has secured counsel experienced in handling consumer class actions.   Neither Plaintiff nor his counsel has any interests which might cause them not to vigorously pursue this claim.

28

14

86.     This action should be maintained as a class action because the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Classes, as well as a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

87.     Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the CCRAA Classes each as a whole.

88.     Whether Defendant violated the FCRA and/or the CCRAA can be easily determined by Defendant's policies and a ministerial inspection of Defendant's business records.

89.     A class action is a superior method for the fair and efficient adjudication of this controversy.  Management of the Classes' claims is likely to present significantly fewer difficulties than those presented in many individual claims.  The identities of the Class members may be derived from Defendant's records.

## CLAIMS

## COUNT I – VIOLATION OF THE FCRA § 1681g(a)

90.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

91.     Pursuant to section 1681n of the FCRA, Defendant is liable for willfully failing to provide consumers such as Plaintiff, upon request, with all information in the consumer's file in violation of 15 U.S.C. § 1681g(a).

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class; that judgment be entered for Plaintiff and

1
2
3
4

the Class against Defendant for statutory and punitive damages for violation of 15 U.S.C.
§1681g, pursuant to 15 U.S.C. § 1681n; that the Court award costs and reasonable
attorney's fees, pursuant to 15 U.S.C. § 1681n; and that the Court grant such other and
further relief as may be just and proper.

5

## COUNT II – VIOLATION OF THE CCRAA § 1785.10

6
7

92.     Plaintiff incorporates the foregoing paragraphs as though the same were set
forth at length herein.

8
9

93.     Defendant is a "consumer credit reporting agency" as defined by Cal. Civ.
Code § 1785.3(d).

10
11

94.     Plaintiff is a "consumer" as that term is defined by Cal. Civ. Code §
1785.3(b).

12
13

95.     The above-mentioned credit reports were "consumer credit reports" as that
term is defined by Cal. Civ. Code § 1785.3(c).

14
15
16
17

96.     Pursuant to Cal. Civ. Code § 1785.31, Defendant is liable for violating the
CCRAA by failing to provide consumers, upon request, with a copy of their disclosure
containing all information on that consumer in violation of Cal. Civ. Code § 1785.10
with respect to Plaintiff and the Class.

18
19
20
21
22
23
24

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the
proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing
Plaintiff and his counsel to represent the Class; that judgment be entered for Plaintiff and
the Class against Defendant for damages of $100 to $5,000 per Class member per
violation under the CCRAA; that the Court award injunctive relief under the CCRAA;
that the Court award costs and reasonable attorney's fees under the CCRAA; and such
other and further relief as may be necessary, just and proper.

25

## COUNT III – VIOLATIONS OF THE FCRA § 1681g(c)

26
27

97.     Plaintiff incorporates the foregoing paragraphs as though the same were set
forth at length herein.

28

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

98.     Pursuant to section 1681n of the FCRA, Defendant is liable for willfully failing to provide consumers such as Plaintiff with a summary of their rights, which are required to be included with consumer disclosures, including the right to dispute information contained therein, in violation of 15 U.S.C. § 1681g(c).

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class; that judgment be entered for Plaintiff and the Class against Defendant for statutory and punitive damages for violation of 15 U.S.C. § 1681g, pursuant to 15 U.S.C. § 1681n; that the Court award costs and reasonable attorney's fees, pursuant to 15 U.S.C. § 1681n; and that the Court grant such other and further relief as may be just and proper

## COUNT IV – VIOLATION OF THE CCRAA § 1785.15(f)

99.     Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

100.    Defendant is a "consumer credit reporting agency" as defined by Cal. Civ. Code § 1785.3(d).

101.    Plaintiff is a "consumer" as that term is defined by Cal. Civ. Code § 1785.3(b).

102.    The above-mentioned credit reports were "consumer credit reports" as that term is defined by Cal. Civ. Code § 1785.3(c).

103.    Pursuant to Cal. Civ. Code § 1785.31, Defendant is liable for violating the CCRAA by willfully failing to provide consumers such as Plaintiff with a summary of their rights, which are required to be included with consumer disclosures, including the right to dispute information contained therein, in violation of CCRAA § 1785.10, with respect to Plaintiff and the Class.

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing

1
2
3
4
5

Plaintiff and his counsel to represent the Class; that judgment be entered for Plaintiff and the Class against Defendant for damages of $100 to $5,000 per Class member per violation under the CCRAA; that the Court award injunctive relief under the CCRAA; that the Court award costs and reasonable attorney's fees under the CCRAA; and such other and further relief as may be necessary, just and proper

6

### COUNT V – VIOLATION OF THE FCRA § 1681e(b)

7
8

104.    Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

9
10
11

105.    Pursuant to sections 1681n and 1681o of the FCRA, Defendant is liable for negligently and willfully failing to maintain reasonable procedures to assure maximum possible accuracy of the consumer reports it sold in violation of 15 U.S.C. § 1681e(b).

12
13
14
15
16
17
18

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class; that judgment be entered for Plaintiff and the Class against Defendant for statutory, actual and punitive damages for violation of 15 U.S.C. §1681e(b), pursuant to 15 U.S.C. §§ 1681n and 1681o; that the Court award costs and reasonable attorney's fees, pursuant to 15 U.S.C. §§ 1681n and 1681o; and that the Court grant such other and further relief as may be just and proper

19

### COUNT VI – VIOLATION OF THE CCRAA § 1785.14(b)

20
21

106.    Plaintiff incorporates the foregoing paragraphs as though the same were set forth at length herein.

22
23

107.    Defendant is a "consumer credit reporting agency" as defined by Cal. Civ. Code § 1785.3(d).

24
25

108.    Plaintiff is a "consumer" as that term is defined by Cal. Civ. Code § 1785.3(b).

26
27

109.    The above-mentioned credit reports were "consumer credit reports" as that term is defined by Cal. Civ. Code § 1785.3(c).

28

18

110.   Pursuant to Cal. Civ. Code § 1785.14(b), Defendant is liable for violating the CCRAA by failing to follow reasonable procedures to assure "maximum possible accuracy" of the reports it sold, in violation of Cal. Civ. Code § 1785.14(b) with respect to Plaintiff and the Class.

WHEREFORE, Plaintiff respectfully prays that an order be entered certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class; that judgment be entered for Plaintiff and the Class against Defendant for damages of $100 to $5,000 per Class member per violation under the CCRAA; that judgment be entered for Plaintiff and the Class against Defendant for actual damages under the CCRAA; that judgment be entered for Plaintiff and the Class against Defendant for actual damages under the CCRAA; that the Court award injunctive relief under the CCRAA; that the Court award costs and reasonable attorney's fees under the CCRAA; and such other and further relief as may be necessary, just and proper

Dated: February 8, 2012

ANDERSON, OGILVIE & BREWER, LLP
and
FRANCIS & MAILMAN, LLC

By: _____
Andrew J. Ogilvie

## JURY TRIAL DEMAND

Plaintiff demands trial by jury on all issues.

ANDERSON, OGILVIE & BREWER, LLP
and
FRANCIS & MAILMAN, LLC

By: _____
Andrew J. Ogilvie

19