1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO A. FERNANDEZ, individually, and on behalf of all others similarly situated,<br><br>                                     Plaintiff,<br><br>v.<br><br>CORELOGIC CREDCO, LLC.,<br><br>                                     Defendant. | Case No.:  20cv1262 JM(SBC)<br><br>**AMENDED FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND GRANTING OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND REPRESENTATIVE SERVICE AWARD** |

Presently before the court is Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement and Motion for Attorneys' Fees, Costs and Class Representative Service Award.  (Doc. Nos. 316, 328.)  A hearing on the motions was held on June 10, 2024.  For the reasons set forth on the record and as explained in more detail below, the motions are **granted**.

## I.      BACKGROUND

### A.  Factual and Procedural Background

This dispute centers around the consumer credit reports Defendant CoreLogic Credco ("Credco") sent to its customers and the alleged inaccurate information contained within these reports.

///

///

Defendant Credco is a California-based consumer reporting agency ("CRA"). Defendant sells consumer reports to mortgage lenders, mortgage brokers, auto dealers, and other entities seeking to evaluate consumer creditworthiness. (Doc. No. 49 ¶¶ 2, 17.)

As a CRA, Defendant is subject to the provisions of the Fair Credit Reporting Act ("FCRA"), 84 Stat. 1125, as amended, 15 U.S.C. section 1681 *et seq*., and the California Consumer Credit Reporting Agencies Act ("CCRAA").  In order to promote "fair and accurate credit reporting" the FCRA "imposes a host of requirements concerning the creation and use of consumer reports." *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 335 (2016). A handful of the FCRA's requirements are relevant to this case.  The Act requires CRAs to "follow reasonable procedures to assure maximum possible accuracy" in consumer reports.  15 U.S.C. § 1681e(b).[1]

The consumer reports Defendant sent to its customers included products called: "ProScan OFAC Report," "Bureau OFAC," "LoanSafe Fraud Manager," "LoanSafe Risk Manager OFAC," and "ProScan ID Index OFAC" (collectively "OFAC reports").  OFAC is the United States Treasury Department's Office of Foreign Assets Control.  *See* Office of Foreign Assets Control, https://ofac.treasury.gov/ (last accessed June 17, 2024).  OFAC maintains a list of "specially designated nationals" ("SDN") who threaten America's national security.  *See id.*  Individuals on the OFAC list include terrorists, drug traffickers, and other serious criminals.  *Id.*  Generally, it is unlawful to transact business with any person on the list.  31 C.F.R. pt. 501, App. 1 (2020).

On June 2, 2020, Plaintiff Marco A. Fernandez filed a putative class action complaint against Defendant in San Diego Superior Court alleging a violation of the FCRA; willful

---

[1] Under the FCRA, consumers can bring a cause of action to sue and recover damages for certain violations.  Pursuant to § 1681g(a) a CRA is required to disclose to consumers the contents of their consumer files at the time of the request, including the identities of companies that had requested reports about them in the previous year.  *See* 15. U.S.C. § 1681g(a).

violations of the CCRAA, CAL. CIV. CODE section 1785.1, *et seq.*[2], and violations of the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE section 17200, *et seq.* (Doc. No. 1-3 at 12-32[3].)  On July 6, 2020, Defendant removed this action to federal court on the basis of federal question jurisdiction, 28 U.S.C. section 1331 and pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. section 1453.  (Doc. No. 1.)

On September 28, 2020, Plaintiff filed the First Amended Putative Class Action Complaint.  (Doc. No. 14, "FAC".)  In October 2019, Plaintiff contends he applied for a mortgage as part of the home-buying process.  (FAC ¶¶ 3, 24.)  Plaintiff alleges that in connection with his application, Pulte Mortgage, LLC requested a credit report from Defendant, and that the report Defendant supplied was inaccurate.  (*Id.* ¶¶ 3, 26.) Specifically, the report furnished by Defendant inaccurately stated Plaintiff was a person on the United States Department of the Treasury OFAC's SDN list.  (*Id.* ¶¶ 4, 32.)

Further, the report supplied by Defendant included a record belonging to "Mario Alberto Fernandez Santana," a resident of Mexico, born in May 1977.  (*Id.* ¶¶ 4, 37.) Plaintiff complains that a "rudimentary review of the record" would reveal that his name, date of birth and address differ vastly from the Mario Alberto Fernandez Santana reported on the credit report furnished by Defendant.  (*Id.* ¶¶ 5, 38-41.)  Additionally, it is alleged that the OFAC/SDN Search Results section of the report generated by Defendant, falsely

---

[2] The CCRAA defines a credit report in almost the same terms as 15 U.S.C. § 1681(a)(d). *See* CAL. CIV. CODE § 1785.3(c) ("'Consumer credit report' means any written, oral, or other communication of any information by a consumer credit reporting agency bearing on a consumer's credit worthiness, credit standing, or credit capacity, which is used or is expected to be used, or collected in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for: (1) credit to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) hiring of a dwelling unit [], or (4) other purposes authorized in Section 1785.11.").

[3] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

reported that Plaintiff "was a match to a suspected narcotics trafficker included on the OFAC-SDN & Blocked Persons List." *Id.* at ¶ 32.

Initially, Defendant filed a Motion to Dismiss the FAC (Doc. No. 15), and then subsequently filed a Motion to Stay Proceedings Pending the Supreme Court's decision in *TransUnion[4] LLC v. Ramirez*, 141 S. Ct. 2190 (2021), (Doc. No. 23).  On April 8, 2021, this court granted Defendant's motion and ordered all proceedings in this action stayed pending the Supreme Court's decision in *Ramirez.*  (Doc. No. 27 at 8.)[5]

On March 25, 2022, this court denied both Defendant's Motion to Dismiss Plaintiff's First Amended Complaint and its Motion to Strike Class Allegations from Plaintiff's First Amended Complaint.  (Doc. No. 48.)

On November 11, 2022, Defendant filed its Motion to Deny Class Certification. (Doc. No. 101).  On February 17, 2023, Plaintiff filed his response in opposition, (Doc. No. 146) and Defendant duly replied (Doc. No. 157).

On February 13, 2023, Plaintiff filed his Motion to Certify Class.  (Doc. No. 138.) On May 8, 2023, Defendant filed its response in opposition, (Doc. No. 235) and Plaintiff duly replied (Doc. No. 251).[6]

---

[4] As courts have depicted the company name "TransUnion" differently in the cases cited within this Order, the court has faithfully reproduced the name as it appears in each case.

[5] In light of the stay, and to assist in managing its own calendar, the court also denied without prejudice Defendant's pending Motion to Dismiss First Amended Complaint as moot.  (Doc. No. 27 at 8.)  In doing so, the court provided that once the stay was lifted, any relevant motions attacking the complaint brought under Federal Rules of Civil Procedure 12 or 23 could be refiled.  (*Id.*)  On June 25, 2021, the Supreme Court rendered its decision in *Ramirez.*  Subsequently, on July 6, 2021, the Parties provided this court with a Joint Status Report (Doc. No. 31), and this court issued a Scheduling Order (Doc. No. 32).

[6] On February 23, 2023, the Parties filed a Joint Motion to Modify Amended Scheduling Order and Continue Hearing and Related Briefing Schedule.  (Doc. No. 166.)  The Parties represented that because they wished to conserve resources in advance of the private mediation set for April 27, 2023, the hearing on the pending Cross Motions on the Class

The Parties participated in numerous settlement negotiations, (*see* Doc. No. 295 at 11), which helped lead to the proposed Settlement currently before the court.

On December 13, 2023, the court held a hearing on Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement (Doc. No. 295) where the court expressed numerous concerns about the Parties' proposal. (*See generally* Doc. No. 300.) In response, the Parties submitted an Amended Settlement Agreement and related documents (Doc. No. 306, 306-1, 306-2, 306-3, 308). The court subsequently granted the motion and preliminarily approved the settlement on February 9, 2024. (Doc. No. 309.)

On May 17, 2024, Plaintiff filed his unopposed Motion for Final Approval of Class Action Settlement. (Doc No. 328.) The final approval hearing took place on June 10, 2024. Two (2) class members have filed objections to the settlement, and seventy (70) members have requested exclusion from the settlement. (*See* Doc. No. 316-5 ¶¶ 22, 23; Doc. No. 331-1 ¶ 4.)

**B. Settlement Agreement Terms**

The Settlement Agreement ("Settlement") provides for settlement and full release of all claims relating to the subject matter of this action and requires Defendant pay a gross settlement amount of $58.5 million, provided by its insurance carriers, allocated as follows: $20,000 as an incentive award for Plaintiff and no greater than 25% of the Settlement Fund, $14,625,000 anticipated to be attorneys' fees. *Id.* ¶¶ 4.3.1, 5.3. Under the terms of the Settlement, Angeion Group ("Angeion") will be used as the Settlement Administrator and will be paid from the Settlement Fund. *Id.* ¶ 4.3.1. The Parties state that:

> Angeion now anticipates that the cost to provide notice and administration services will be approximately $2,150,000 [] stem[ming] from: (1) the costs of postage and printing to mail checks to hundreds of thousands of Class Members who will now receive payment automatically []; (2) the costs

---

Certification issue should be reset. (*Id.*) The court denied-in-part and granted-in-part the Parties' request, with the hearing on the motions being reset to June 5, 2023. (Doc. No. 172.)

associated with a second distribution to Settlement Class Members who cash checks from the initial distribution or who have elected to receive payments through alternate means; and (3) the cost of the paid media campaign.[7]

Doc. No. 306 at 10-11.

Defendant provided data to Plaintiff regarding its OFAC Reports and produced data related to consumer file and report requests, along with agreed upon supplemental data. The Parties refer to this information as the "Class Data." Doc. No. 306-1 ¶ 4.2.2. Plaintiff provided the Class Data to the Settlement Administrator. *Id*. The information in the Class Data was needed in order to compile the "Settlement Class Notice List," which is the list of those consumers to whom notice was sent. *Id*. ¶ 2.32, 4.2.2. Settlement class members who are listed on the Settlement Class Notice List are eligible for a cash payment. *Id*. ¶ 4.3.1.1. A settlement class member who is not on the Settlement Class Notice List, but who submits a Claim Form and provides reasonable proof of class membership, is eligible for a cash payment. *Id.*

In the Settlement, the Parties changed the class definitions from those set forth in the FAC[8] and whittled the classes down to three. The Settlement here envisions certification of three classes consisting of:

---

[7] In the original submission, that required the 705,000 members of the Inaccurate Reporting Class to file a claim form and attestation in order to receive any cash payment, the Parties stated that "[t]he precise amount of administration costs [would] depend on the ultimate claims rate, but for a claims rate of 7%-10%, Angeion "has agreed to a 'not to exceed' amount' of $1,425,000." Doc. No. 295 at 14.

[8] In the FAC Plaintiff sought to represent seven classes consisting of:

**1. Inaccurate Reporting Class**
All individuals who were the subjects of consumer reports furnished by Defendant which contained public record information in the "OFAC/SDN" section of the reports where the name or date of birth or address of the subject of the report does not match the name or date of birth or address in the government database in the

seven years predating the filing of the initial Complaint in this matter and continuing through the date the class list is prepared.

**2.  Inaccurate Reporting FCRA Class**

All individuals who were the subjects of consumer reports furnished by Defendant which contained public record information in the "OFAC/SDN" section of the reports where the name or date of birth or address of the subject of the report does not match the name or date of birth or address in the government database in the five years predating the filing of the initial Complaint in this matter and continuing through the date the class list is prepared.

**3.  Inaccurate Reporting UCL Subclass**

All individuals who were the subjects of consumer reports furnished by Defendant which contained public record information in the "OFAC/SDN" section of the reports where the name or date of birth or address of the subject of the report does not match the name or date of birth or address in the government database in the four years predating the filing of the initial Complaint in this matter and continuing through the date the class list is prepared.

**4.  Failure to Disclose Class**

All individuals (1) who were the subjects of consumer reports furnished by Defendant which contained public record information in the "OFAC/SDN" section of the reports where the name or date of birth or address of the subject of the report does not match the name or date of birth or address in the government database (2) who made a request to Defendant for their consumer file or report and (3) for whom Defendant did not disclose the OFAC/SDN information.  The class period is all persons who made requests to Defendant in the five years predating the filing of the initial Complaint in this matter and continuing through the date the class list is prepared.

**5.  Failure to Identify Class**

All individuals (1) who were the subjects of consumer reports furnished by Defendant (2) who made a request to Defendant for their consumer file or report and (3) for whom Defendant did not identify the user that procured the consumer report within the one-year period on which the request was made.  The class period is all persons who made requests to Defendant in the five years predating the filing of the initial Complaint in this matter and continuing through the date the class list is prepared.

**6.  Failure to Disclose UCL Subclass**

All individuals (1) who were the subjects of consumer reports furnished by Defendant which contained public record information in the "OFAC/SDN" section of the reports where the name or date of birth or address of the subject of the report does not match the name or date of birth or address in the government

- **Inaccurate Reporting Class:**
  All individuals who were the subject of an OFAC Report that Defendant disseminated to a third party from June 3, 2013 through August 28, 2023, where the OFAC Report reported at least one hit, match, possible match, or "record for review."

- **Failure to Disclose Class:**
  All individuals (i) who were the subject of an OFAC Report that Defendant disseminated to a third party from June 3, 2015 through August 28, 2023, where the OFAC Report reported at least one hit, match, possible match or "record for review"; and (ii) who made a request to Defendant for their consumer file or report after such OFAC Report had been disseminated.

- **Failure to Identify Class:**
  All individuals who, from June 3, 2015 to June 30, 2021, made a request to Defendant and to whom Defendant provided a consumer file disclosure.

Doc. No. 306-1 ¶ 2.31.  The Inaccurate Reporting Class and Failure to Disclose Class have a Class Period of June 3, 2013, through August 28, 2023, whereas the Failure to Identify Class Period spans from June 3, 2015 to June 30, 2021.  *Id*.

According to the Settlement, there will be 7,400 Failure to Identify class members who will each receive an award of $500.  Doc. No. 306-1 ¶¶ 4.1, 4.3.1.2.  Additionally, there are 3,600 Failure to Disclose class members who will each receive a $1,000 award.

---

database (2) who made a request to Defendant for their consumer file or report and (3) for whom Defendant did not disclose the OFAC/SDN information.  The class period is all persons who made requests to Defendant in the four years predating the filing of the initial Complaint in this matter and continuing through the date the class list is prepared.

**7. Failure to Identify UCL Subclass**

All individuals (1) who were the subjects of consumer reports furnished by Defendant (2) who made a request to Defendant for their consumer file or report and (3) for whom Defendant did not identify the user that procured the consumer report within the one-year period on which the request was made.  The class period is all persons who made requests to Defendant in the five years predating the filing of the initial Complaint in this matter and continuing through the date the class list is prepared.

FAC at 11-12.

*Id.* Finally, 705,000 putative class members have been identified in the Inaccurate Reporting Class, and each shall receive a pro rata payment from the Net Settlement Fund. *Id.* If an individual is a member of multiple Settlement Classes, they will receive payment for each settlement class for which they are a member. *Id.* ¶ 4.3.1.1.

Settlement class members have ninety (90) days after their checks are mailed to negotiate them. (Doc. No. 306-1 ¶ 4.3.1.4.) Any remaining amounts left in the Settlement Fund, including those resulting from uncashed or returned checks, shall be redistributed as a second payment to each Inaccurate Reporting settlement class member who cashed their original paper check or received payment through electronic means, if the distribution would be at least $5. *Id.* Should redistribution be infeasible or should amounts remain in the Fund even after redistribution, the Settlement Administrator shall donate any residual amounts left in the Settlement Fund to the Lawyers' Committee for Civil Rights as a *cy pres* recipient. *Id.* The *cy pres* recipient shall agree to use the funds for non-litigation purposes. Under no circumstances shall any amount of the Settlement Fund revert to the Defendant. *Id.*

As part of the Settlement, Defendant has agreed to: (1) maintain procedures meant to ensure that no ProScan OFAC reports state "possible match" when the only matching data element is the name; (2) maintain procedures meant to ensure that its ProScan OFAC reports do not state "possible match" where the only matching element between the consumer and countries/vessels is the consumer's name; and (3) remove the "Search Criteria" field from its ProScan OFAC reports. Doc. No. 306-1 at 57-59 (Consent Injunctive Relief Order). In sum, Defendant will improve its matching criteria for its ProScan OFAC reporting and the formatting of its reports.

In exchange for their share of the Settlement, all class members are deemed to release Defendant from claims relating to the subject matter of this action, including under the FCRA, California law, common law, or under any other principle of law or equity resulting from, arising out of, or related to any allegations in the FAC. Doc. No. 306-1 ¶¶ 2.28, 4.4.2, 4.4.

The separately filed Motion for Attorneys' Fees, Costs and Class Representative Service Award (Doc. No. 316) seeks: (1) 25 percent of the class action settlement amount, or $14,625,000 for attorneys' fees; (2) reimbursement of $898,296.75 in litigation costs and expenses; (3) reimbursement to the Settlement Administrator for the costs associated with notice and claims administration, in an amount not to exceed $2,135,228; and (4) a $20,000 class representative award for named Plaintiff, Marco Fernandez.  (*See generally*, Doc. No. 316.)

## II.    FINAL APPROVAL OF SETTLEMENT

### A. Certification of the Settlement Class

Before approving the Settlement, the court's "threshold task is to ascertain whether the proposed settlement class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure applicable to class actions, namely: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation."  *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011).  In the settlement context, the court "must pay undiluted, even heightened, attention to class certification requirements."  *Id.*  In addition, the court must determine whether class counsel is adequate (Fed. R. Civ. P. 23(g)), and whether "the action is maintainable under Rule 23(b)(1), (2), or (3)."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (quoting *Amchem Prod., Inc., v. Windsor*, 521 U.S. 591, 614 (1997)).

### 1.  Federal Rule of Civil Procedure 23(a)'s Requirements

The court will begin with the threshold task of determining if Rule23(a)'s four requirements continue to weigh in favor of settlement.

#### *i.     Numerosity*

The "numerosity" requirement is satisfied if the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  "[P]roposed classes of less than

fifteen are too small while classes of more than sixty are sufficiently large." *Harik v. Cal. Teachers Ass'n.,* 326 F.3d 1042, 1051-52 (9th Cir. 2003).

Here, after receiving the Class Data, and "[a]fter combining the lists [provided] and removing duplicative records, Angeion identified 706,066 unique Settlement Class Member records." Doc. No. 328-2, ¶4. Considering this information and applying common sense, the court is comfortable concluding that the proposed classes will be comprised of enough members to be sufficiently large. *See, e.g., Walker v. Hewlett-Packard Co.,* 295 F.R.D. 472, 482 (S.D. Cal. 2013) (citing *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008) ("A class greater than forty members often satisfies this requirement ...."); *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 256 (C.D. Cal. 2008) ("Although plaintiffs need not allege the exact number or identity of class members to satisfy the numerosity requirement, mere speculation as to the number of parties involved is insufficient.") (citation omitted). *See also* 1 Newberg on Class Actions, § 3:13 ("[A] good-faith estimate of the class size is sufficient when the precise number of class members is not readily ascertainable. The estimate generally should be supported by more than speculation ..."). Joinder of all these potential plaintiffs would be impracticable. Accordingly, for purposes of settlement, the numerosity requirement has been met.

### ii. Commonality

The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "What matters to class certification ... is not the raising of common 'questions' – even in droves – but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart,* 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Aggregate Proof*, 84 N.Y.U.L. Rev. 97, 132 (2009)) (emphasis in original). Class members' claims must "depend upon a common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

As the court outlines in detail below, here, the commonality requirement is satisfied for all three classes because the class claims involve common questions of law and fact regarding Defendant's OFAC reports.

### a. Inaccurate Reporting Class

As noted in the court's Preliminary Approval Order (Doc. No. 309), there are three central issues common to the Inaccurate Reporting Class.  The first common issue is whether Defendant's OFAC reports should be considered consumer reports under the FCRA and CCRAA.  The second common issue is whether Defendant's name-only matching procedure was reasonable to ensure the maximum possible accuracy of the information furnished by Defendant to its customers.  *See Ramirez v. Trans Union, LLC,* 301 F.R.D. 408, 418 (N.D. Cal. 2014) ("[T]he question of whether using the name-only matching logic assures maximum accuracy is [] a [common] question.").  Put another way, did Defendant follow the industry standard and practice in how it ran OFAC searches, or should it have run these searches by setting the search parameters to compare all available customer inputs against the entries on the OFAC Lists?  *See Adan v. Insight Investigation, Inc.,* No. 16cv2807-GPC(WVG), 2018 WL 467897, at *12 (S.D. Cal. Jan. 18, 2018) (denying defendant's motion for summary judgment on claim of willful FCRA section 1681 violation based on first and last name and date of birth criminal record matching); *Patel v. Trans Union, LLC,* 308 F.R.D. 292, 304 (N.D. Cal. 2015) (commonality found where one of the "most central questions" in suit was "were there reasonable procedures in place (here, the name only logic) to ensure the maximum possible accuracy of the information?").  The third common issue is: if Defendant did follow industry practice, does conforming to these industry standards shield it from FCRA liability?  Accordingly, for purposes of settlement, the commonality requirement has been met for the Inaccurate Reporting Class.

### b. Failure to Disclose and Failure to Identify Classes

Turning to the Failure to Disclose Class, the Preliminary Approval Order also explained that the underlying common question is whether Defendant violated 15 U.S.C.

section 1681g(a) by failing to disclose OFAC report results to consumers who requested their files or consumer reports.  As for the Failure to Identify Class, the common question underlying all class member's claims is whether Defendant violated the FCRA by failing to disclose inquiry history to all individuals making "consumer file disclosure requests." Defendant's anticipated defense poses a common question that can be resolved with common proof.  Additional common questions include whether Defendant's 15 U.S.C. section 1681g(a) violations were willful and the proper measure of statutory and punitive damages.

Further, like the Inaccurate Reporting Class, these classes involve common questions surrounding Defendant's patterns and procedures.  For example, a common question is whether the disclosure was accurate. Another common question surrounds whether Defendant consistently failed to disclose the OFAC report's "possible matches" reporting to consumers who requested their files in violation of § 1681g(a).  This is sufficient to establish commonality.  *See Patel,* 308 F.R.D. at 304 (concluding commonality met for 15 U.S.C. § 1681g violation subclass because  a "central issue" was whether defendant disclosed the potential OFAC hit reporting to consumers who requested their files); *Larson v. Trans Union, LLC*, No. 12–cv–05726–WHO, 2015 WL 3945052, *10 (N.D. Cal. June 26, 2015) ("The question of whether Trans Union violated section 1681g's clear and accurate disclosure requirement is sufficient to establish commonality."). In sum, Defendant's patterns and practices in responding to disclosure requests for OFAC reports published to consumers comprise the proverbial "glue" holding these classes together.  Accordingly, for purposes of settlement, the commonality requirement has been met for the Failure to Disclose and Failure to Identify classes.

### iii.    Typicality

The typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be identical." *Hanlon,*

150 F.3d at 1020.  Typicality "refers to the nature of the claim or defense of the class representative, and not to specific facts from which it arose or the relief sought." *Parsons v. Ryan,* 754 F.3d 657, 865 (9th Cir. 2014).  Typicality can be measured by looking at "'whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  *Torres v. Mercer Canyons Inc.,* 835 F.3d 1125, 1141 (9th Cir. 2016) (quoting *Hanon v. Dataproducts Corp*, 976 F.2d 497, 508 (9th Cir. 1992)).

Plaintiff's claims are typical of the classes he seeks to represent, as set forth in the FAC.  For the Inaccurate Reporting Classes, it is alleged Defendant prepared and disseminated OFAC reports to third parties that falsely identified Plaintiff and each putative class member as "possible matches" to the OFAC SDN list.  *See e.g., Kang v. Credit Bureau Connection, Inc.,* No. 1:18-cv-01359-AWI-SKO, 2022 WL 658105, *4 (E.D. Cal. Mar. 4, 2022) (finding plaintiff's claims typical of class where "defendant prepared a report about [plaintiff] and each class member that included an inaccurate OFAC 'Hit' generated by its 'similar name' matching script and published that OFAC information to its customers.").  For the Failure to Disclose and Failure to Identify Classes, the disclosures Plaintiff and the putative class members received were allegedly incomplete and did not meet the regulatory requirements.  *See, e.g., Larson,* 2015 WL 3945052, at *13 (finding typicality met where plaintiff alleged that defendant provided inadequate OFAC disclosures and "[plaintiff's] claims are reasonably coextensive with those of absent class members.").  At bottom, Defendant's patterns and procedures, the alleged willfulness of Defendant's conduct, and the alleged resulting violations of the applicable statutory provisions are logically consistent amongst class members.  *Cf. Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) ("[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical.") (citation omitted).

Additionally, the defenses that apply to Plaintiff and putative class members will be similar, if not identical.  Furthermore, although Plaintiff and each putative class member's individualized experience will differ slightly, this need not defeat typicality.  Finally, an additional positive weighing in favor of typicality is that all members would benefit from the injunctive relief requested.  Accordingly, for purposes of settlement, the typicality requirement has been met.

### iii.   Adequacy

The final Rule 23(a) requirement is that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requires that the court address two questions: "(a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class."  *In re Mego*, 213 F.3d at 462.  A court certifying a class must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the class."  *Id.* at 23(g)(1)(B).

Here, there is no obvious conflict between Plaintiff's interests and those of the classes.  Plaintiff has demonstrated that he has fairly and adequately protected the interests of the other members of the classes as required by Rule 23.  He has vigorously assisted counsel in litigating this case, responded to discovery, and participated in the mediation and settlement negotiations.  *See* Doc. No. 295-1 at ¶ 9.  Plaintiff's counsel maintain they have "diligently investigated and litigated the claims at issue here," *id.* at ¶ 6, "zealously represent[ing]" the settlement classes "for well over three years of labor-intensive litigation with no guarantee of a successful resolution," thereby "show[ing] laudable dedication" to the settlement classes.  Doc. No. 295 at 17, 18.  The court has no reason to doubt the qualifications or legal acumen of the firm of Berger Montague to represent the classes.  *See*

1   *id.* at ¶ ¶ 6, 8, 10-15, 17-19.   Accordingly, for settlement purposes, the court finds this
2   element satisfied for the purposes of approval.

3   ## 2.  Federal Rules of Civil Procedure Rule 23(b)(3)'s Requirements

4   Having determined that Rule23(a)'s requirements have been met, the court will next
5   consider if Rule 23(b)(3)'s factors continue to weigh in favor of settlement.

6   "Rule 23(b)(3) permits a party to maintain a class action if . . . the court finds that
7   the questions of law or fact common to class members predominate over any questions
8   affecting only individual members, and that a class action is superior to other available
9   methods for fairly and efficiently adjudicating the controversy." *Conn. Ret. Plans & Trust*
10  *Funds v. Amgen Inc.,* 660 F.3d 1170, 1173 (9th Cir. 2011), *aff'd* 133 S. Ct. 1184 (2013)
11  (citing Fed. R. Civ. P. 23(b)(3)).   The "predominance inquiry tests whether proposed
12  classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon,*
13  150 F.3d at 1022 (quoting *Amchem Prods, Inc.,* 521 U.S. at 623).   An examination into
14  whether there are "legal or factual questions that qualify each class member's case as a
15  genuine controversy" is required.  *Id.*  The superiority inquiry "requires determination of
16  whether the objectives of the particular class action procedure will be achieved in particular
17  the case." *Id.* at 1023.

18  ### i.   *Predominance*

19  As set forth in the court's Preliminary Approval Order, there are three core questions
20  common to all settlement classes here, namely: "(1) whether [Defendant's] conduct
21  violated the applicable provision of the FCRA/CCRAA; (2) whether [Defendant's] conduct
22  was willful; and (3) the proper measure of statutory and punitive damages."  Doc. No. 309
23  at 17. *See, e.g.*, *Kang,* 2022 WL 658105, at *6 (finding the predominance requirement met
24  where "[t]he primary common question is whether Credit Bureau's 'similar name'
25  matching script system was a reasonable procedure to assure maximum possible accuracy
26  of the OFAC information it prepared for its customers."); *Patel,* 308 F.R.D. at 308
27  (concluding that common questions including "Was there a disclosure?," "Was the
28  disclosure accurate?," "Were there reasonable procedures in place (here the name only

logic) to ensure the maximum possible accuracy of the information" and "Did [the CRA] include the [OFAC] alert information when it sent disclosures to consumers who had [OFAC] 'alerts' in the[ir consumer] reports?" predominate); *Martinez v. Avantus, LLC,* NO. 3:20-CV-1772 (JCH), 2023 WL 112807, at *9 (D. Conn. Jan. 5, 2023) ("[T]he core inquiries in this case – whether the name-matching logic runs afoul of the FCRA and whether the violation was willful – can be resolved through generalized proof and are more substantial than any individualized issue.").

Additionally, the defenses that Defendant will likely raise appear to be common to the classes and suggest class action treatment is the correct course of action. *See Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474, 490 (E.D. Cal. 2006) (concluding that common issues predominated where defendant asserted affirmative defense that it alleged would potentially bar recovery for certain claims). Further, since Plaintiff is seeking only statutory and punitive damages, the need for individualized damage determinations is obviated. This decision illustrates that common damages predominate, lending further support in favor of class treatment. *See Martinez*, 2023 WL 112807, at *9 ("common issues also predominate the question of damages, because the class-wide pursuit of statutory and punitive damages greatly diminish the need for individual inquiry.").

### ii. *Superiority*

As previously explained, in this instance, the class-action is superior because: (1) individual members of the classes have no interest in controlling the prosecution of this case; (2) Plaintiff's counsel is unaware of any similar suits brought against Defendant related to its OFAC reports and consumer disclosures; and (3) bringing all potential class member's claims in one action saves judicial resources. (Doc. No. 309 at 18.) *See, e.g., Haynes v. Logan Furniture Mart, Inc*., 503 F.2d 1161, 1165 (7th Cir. 1974) ("The individual if aware of all of his claims under the [Truth in Lending] Act is bound to have some reluctance to sue in his own name the supplier with whom he continues to do business and one who could be in a position to visit harsh remedies on the buyer in the event of a subsequent default.") *See* 7 Newberg on Class Actions § 21:4 (6th ed. 2022) ("FCRA

matters remain good candidates for class actions – they tend to involve a large number of harmed individuals with small claims, often disbursed throughout the country.  Absent a class suit, many FCRA violations would remain un-remedied.").

In sum, for purposes of settlement, the relatively limited potential recovery for the class members as compared with the costs of litigating the claims support the conclusion that a class action is superior to other methods for adjudicating this controversy.  Thus, Plaintiff has satisfied the requirements for certification of classes under Rule 23. Accordingly, the settlement classes are **CERTIFIED** for settlement purposes only.

## B. Final Approval of Class Settlement under Federal Rule of Civil Procedure 23(e)

Having certified the settlement classes, the court will next consider the terms of the Settlement Agreement itself and determine if whether the proposed settlement is "fair, reasonable and adequate" pursuant to Rule 23(e)(2).

When a settlement is reached prior to formal class certification, "such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Headset Products. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P.  23(e).  "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon,* 150 F.3d at 1025.  The Rule also "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate and reasonable." *Id.* at 1026.  In making this determination, the court is required to "evaluate the fairness of a settlement as a whole, rather than assessing its individual components." *Lane v. Facebook, Inc.*, 696 F.3d 811, 818-19 (9th Cir. 2012).  Because a "settlement is the offspring of compromise, the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027.

Traditionally, district courts within the Ninth Circuit balance several factors when assessing a settlement proposal, namely:

> the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id.* at 1026.

As amended Rule 23(e) provides that that a court may approve a proposed class action settlement after considering whether:

(A) the class representative and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

> (i)   the costs, risks, and delay of trial and appeal;
>
> (ii)  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

When reviewing a proposed settlement, the court's primary concern "is the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.,* 688 F.2d 615, 624 (9th Cir. 1982). Ultimately, "[i]n most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 526 (C.D. Cal. 2004).

### 1. Rule 23(e)(2) Factors

In its Preliminary Approval Order, this court found that the applicable Rule 23(e)(2) factors weighed in favor of approving the Settlement. (*See* Doc. No. 309 at 21-27.) No pertinent facts have changed since the court reached its earlier conclusion. Thus, the court

reaffirms and incorporates by reference its analysis of the Rule 23(e)(2) requirements as set forth in its Preliminary Approval Order.  (*See id*.) Accordingly, the court finds the Settlement meets the requirements of Rule 23(e)(2).

### 2. Adequacy of Notice

"Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon*, 150 F.3d at 1025.  For the court to approve a settlement, "[t]he class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice." *Officers for Justice,* 688 F.2d at 624 (citation omitted).

The court approved notice of this class action and proposed settlement in the June 16, 2024, Preliminary Approval Order.  The Agreement called for sending the Notice directly to class members through email ("email notice") and/or via U.S. Mail.  ("notice packet"). In support of his Motions, Plaintiff has filed the Declaration of Lacey Rose, who is employed as a "Senior Project Manager with Angeion," and the Declaration of Steven Weisbrot, the President and Chief Executive Officer of Angeion, the Settlement Administrator retained in this matter. *See generally,* Doc. No. 316-5, Doc. No. 329.  Both declarations detail the actions taken by the Administrator including the implementation of a Settlement website and toll-free hotline dedicated to informing class members of their rights and options under the settlement and commencement of a state-of-the-art media notice campaign.  (*Id*.)  The Settlement Administrator declares that the email notices reached 428,422 class members, and 700,302 Notice Packets were mailed directly to class members.   (Doc. No. 316-5 ¶¶ 12, 13; Doc. No. 329 ¶¶ 12-15.)  The Administrator reports that, to date, the Settlement website, has been visited 116,555 times by 96,461 unique users, since it was established on March 1, 2024.  (Doc. No. 329, at ¶ 23.)  Additionally, the toll-free number, which opened on March 8, 2024, has received 16,083 calls, totaling 67,012 minutes.  (*Id.* ¶ 24.)

The Notices advised the classes of the terms of the Settlement, of their rights: (1) to participate and how to receive payment of their share of the Settlement; (2) to object to the Settlement and to appear at the Final Approval Hearing; (3) to request exclusion from the

Settlement; (4) the manner and timing for doing any of these acts; and (5) the date and time set for the Final Approval Hearing.  Included on the Notices was adequate information regarding the different class periods.  The Notices also displayed the Settlement's website: www.OFACListSettlement.com and the toll-free number 1-888-714-4146.

As of the date of this order, two (2) class member have objected to the Settlement.

Accordingly, the court determines that the Notice in the case was copious, impressive, more than adequate, and satisfied both the requirements of Rule 23 and due process, giving the settlement class members adequate notice of the Settlement.

Furthermore, the Administrator sent CAFA Notice to the Attorneys General for all 50 states and territories, as well as the Attorney General of the United States.  (Doc. No. 315-6 at ¶ 4, 5, Exhibits A, B.)  Accordingly, the court determines that the appropriate CAFA notice has been given.  *See* 28 U.S.C. § 1715(b) (requiring settling defendants give notice of a proposed class settlement to appropriate state and federal officials).

### 3.  Additional Ninth Circuit Factors

According to the advisory committee's note to the 2018 amendment to Federal Rule Civil Procedure 23(e)(2), the goal of the revised factors was "not to displace any factor [developed by a circuit], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  Fed. R. Civ. P. 23(e)(2).  The court will, therefore, now turn to the various Ninth Circuit factors as enumerated in *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998).

### i.    Strength of Plaintiffs' Case; Risk of Further Litigation; and Risk of Maintaining Class Action Status

The preferable nature of settlement over the uncertainties, expense, and length of litigation, means "when assessing the strength of plaintiff's case, the court does not reach any ultimate conclusions regarding the contested issues of fact and the law that underlie the merits of this litigation." *Four in One Co. v. S.K. Foods, L.P.,* No. 2:08-CV-3017 KJM EFB, 2014 WL 4078238, at *7 (E.D. Cal. Aug. 14, 2014) (internal quotations omitted).

Similarly, "a proposed settlement is not to be judged against a speculative measure of what might have been awarded in a judgment in favor of the class." *Nat'l Rural Telecomms. Coop,* 221 F.R.D. at 526.

Here, the Settlement was reached just over three years after this case was filed and involved disputed legal claims and issues. Although Plaintiff is confident in his case, the risks of further litigation are significant, class certification and summary judgment are yet to be decided and there are no guarantees that Plaintiff would secure a favorable decision on the merits. Additionally, Plaintiff has to prove Defendant acted negligently or willfully to recover under the FCRA, "an onerous task with a highly uncertain outcome." *Domonoske v. Bank of Am., N.A*., 790 F. Supp. 2d 466, 475-76 (W.D. Va. 2011) (approving FCRA settlement, noting that with "the difficulties of proving willfulness or even negligence with actual damages [under the FCRA], there was a substantial risk of nonpayment."). Defendant also presents defenses to class liability and damages determinations, and there is no guarantee Plaintiff will prevail. The court finds these risks weigh in favor of settlement.

### ii.    *The Amount Offered in Settlement*

"Basic to [the process of deciding whether a proposed settlement is fair, reasonable and adequate] * * * is the need to compare the terms of the compromise with the likely rewards of litigation." *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 422 (N.D. Cal. 2009) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 3980 U.S. 414, 424-25 (1968)). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1242 (9th Cir. 1998) (citation omitted).

Here, the amount offered in settlement is more than adequate and supports final approval. The Settlement authorizes a recovery of $58,500,000.00, less court-awarded fees and expenses and the costs of administering the settlement. Both the Failure to Disclose and Failure to Identify Classes will receive automatic cash payments from Defendant of

either $1000 or $500, respectively.  (Doc. No. 328 at 16; Doc. No. 306-1 ¶¶ 4.1, 4.3.1.2.)  The 705,000 estimated Inaccurate Reporting Class Members, however, will each receive a *pro rata* share of the Settlement Fund, Doc. No. 306-1 ¶ 4.3.1.2, with each class member receiving an automatic payment of approximately $47, with an anticipated second payment in the same amount, Doc. No. 328 at 16-17.

In light of the risks associated with continuing this litigation, the court finds the proposed payouts to be fair, reasonable and adequate and the total to be in favor of approval of the settlement.   The relief is also adequate under Rule 23(e)(2) considering the effectiveness of the method of distributing the funds directly to the class members' bank accounts or via check without the requirement for a claims process for two of the three classes, the non-revisionary nature of the settlement, the terms of the proposed award of attorneys' fees, and the fact that any delay of trial and appeal may result in zero recovery.

### iii.    *Cy Pres Funds*

"A *cy pres* remedy, sometimes called 'fluid recovery,' *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004), is a settlement structure wherein class members receive an indirect benefit (usually through defendant donations to a third party) rather than a direct monetary payment." *Lane*, 696 F.3d at 819.  The "*cy pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries." *In re Google Inc. Street View Elec. Commc'ns. Litig.* 21 4th 1102, 1111 (9th Cir. 2021) (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011)).   The requirement "that a cy pres remedy must be the 'next best distribution' of settlement funds means only that a district court should not approve a *cy pres* distribution unless it bears a substantial nexus to the interests of the class members." *Lane*, 696 F.3d at 821 (quoting *Nachshin*, 663 F.3d at 1036) (finding a substantial nexus between Facebook privacy claims and charity giving grants promoting online privacy and security).  "The district court's review of a class-action settlement that calls for a *cy pres* remedy is not substantively different from that of any other class-action settlement except that the court should not find the settlement fair, adequate, and reasonable unless the *cy*

*pres* remedy 'account[s] for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members . . . .'" *Lane*, 696 F.3d at 819-20 (quoting *Nachshin*, 663 F.3d at 1036).

Here, Plaintiff alleges violations of the FCRA, CCRAA, and UCL.  The FCRA and CCRAA were designed to promote to promote fair and accurate credit reporting, protect consumer privacy, and regulate the CRA's that compile and disseminate personal information about consumers.  *See, e.g., TransUnion LLC,* 141 S. Ct. at 2200; 15 U.S.C. § 1681(a).   The Settlement Agreement provides that if redistribution to Inaccurate Reporting settlement class members "be infeasible or should amounts remain in the Fund even after redistribution, the Settlement Administrator shall donate any residual amounts left in the Settlement Fund to the Lawyers' Committee for Civil Rights as a *cy pres* recipient." Doc. No. 306-1 ¶ 4.3.1.4.  The *cy pres* recipient shall agree to use the funds for non-litigation purposes.   *Id.*   The organization has assisted with major civil rights advancements over the years, and has served as an expert on civil rights matters, testified before Congress and issued public statements.   Accordingly, the substantial nexus requirement is satisfied.

### iv.   *Extent of Discovery and Stage of Proceedings*

A court should focus on whether the "parties have sufficient information to make an informed decision about settlement." *In re Mego*, 213 F.3d at 459 (quoting *Linney,* 151 F.3d at 1239). *See also Onitverso v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014) ("A settlement that occurs in an advanced stage of the proceedings indicates the parties carefully investigated the claims before reaching a resolution.").

Here, the Parties have litigated this case for over three years, with Plaintiff filing an original complaint, First Amended Complaint, and defending motions to strike and dismiss. The Settlement was reached during the briefing period surrounding cross motions on the issue of class certification.  Both Parties have been engaged in formal and informal discovery and document exchange.  Class Counsel were involved in twenty-three (23) depositions, multiple expert reports were exchanged, and both Plaintiff and his wife were

deposed.  The Parties also engaged in two mediation sessions with a neutral third party and settlement sessions before Magistrate Judges Burkhardt and Schopler.  Thus, the court is comfortable concluding that the Parties have "sufficient information to make an informed decision about settlement." *Linney,* 151 F.3d at 1239.  Accordingly, this factor weighs in favor of approval of the settlement.

### v.   Experience of Counsel

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citing *Boyd v. Bechtel Corp.,* 485 F. Supp. 610, 622 (N.D. Cal. 1979)).  Here, Class Counsel has provided a declaration detailing their experience in prosecuting class actions similar to this one.  Class Counsel, through Ms. Drake's declaration, attest that "the Settlement is fair, reasonable, and adequate."  Doc. No. 328-1 at ¶ 9.  Ms. Drake has also attested that, to her knowledge, "the $58.5 million Settlement Fund established here makes this the second-largest ever recovery in the over fifty-year history of the FCRA."  Doc. No. 316-1 at ¶ 32.  In light of the foregoing, and affording proper weight to the judgment of counsel, the court finds this factor weighs in favor of the settlement.

### vi.   Reaction of Class Members

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement are favorable to the class members." *Nat'l Rural Telecomm. Coop., Inc.,* 221 F.R.D. at 529 (citations omitted).  Here, seventy (70) class members have opted out of the classes and two (2) objections to the settlement have been received.  (Doc. No. 329, ¶ 27; Doc. No. 333-1 ¶ 4.).  The very small number of requests for exclusion and absence of a large number of objections weighs in favor of settlement.

#### a. Objections to the Settlement

On April 9, 2024, the court received an objection from Thomas Dorn stating he objected to the settlement because: "1. [He] never received a 2020 covid stimulus payment for $1200 U.S. Dollars.  2. [He] never received [his] 2018 tax refund for $726 Dollars.

3. [He] was terminated from a financial services job as a software engineer.  4. [He] believe[s] that the above wrongdoings (1, 2, 3, 5) are due to the situation of Marco A. Fernandez v. CoreLogic Credco LLC.  5. [He is] missing an unemployment check from Colorado for around $933 dollars."  Doc. No. 317 at 1.  But Mr. Dorn focuses on issues individualized to himself that are not case related, therefore, his objections are not significant enough to bar final approval.  Thus, the court **OVERRULES** this Objector's objections as they are specific to the individual Objector such that they do not raise a genuine concern as to all class members and are unrelated to this matter.

The second Objector, Mr. Ortiz, challenges the amount that members of the Inaccurate Reporting Class are expected to receive under the Settlement.  Specifically, Mr. Ortiz: "objects to the projected amount of $47.00 and asks the Court to (1) reconsider an adequate amount based on Company Credco actions.  I feel my name was violated by racial profiling (2) Please provide written documentation to David Ortiz at address [] verifying I am certainly not on the OFAC list, as this will negatively impact one's life."  Doc. No. 328-2.  However, one individual's dissatisfaction with the amount of compensation offered should not be grounds to bar final approval.  *See Browne v. Am. Honda Motor Co.,* 2010 WL 9499072, at *18 (C.D. Cal. July 19, 2010) (overruling 117 objections, including those related to the settlement amount, explaining "[w]hile the proposed settlement does not perfectly compensate every member of the class, it is unlikely that any settlement of the claims of a class of more than 740,000 members would achieve such a result.").  Thus, the court **OVERRULES** this Objector's objection as it does not raise a genuine issue of concern as to all class members.

### vii.    Other Factors

In looking at the fairness of the settlement, the court considers two additional factors: the process by which the settlement was reached and the involvement of the named plaintiff in the process.  *See Young v. Polo Retail, LLC,* No. C-02-4546 VRW, 2007 WL 951821, *3 (N.D. Cal. Mar. 28, 2007) (adding factors "(9) the procedure by which the settlements were arrived at, see MANUAL FOR COMPLEX LITITGATION (FOURTH) § 21.6 (2004), and

(10) the role taken by the plaintiff in that process.").  Here, the Parties reached agreement after attending an Early Neutral Evaluation with Magistrate Judge Schopler, a settlement conference before Magistrate Judge Burkhardt, and two mediation sessions before a neutral third party.  Thus, the court can put "a good deal of stock in the product of an arms-length, non-collusive negotiated resolution." *Rodriquez v. West Publ'g Grp.,* 563 F.3d 948, 965 (9th Cir. 2009).  *See also Todd v. STARR Surgical Co.*, No. CV 14-5263 MWF (GJSx), 2017 WL 4877417, at *2 (C.D. Cal. Oct. 24, 2017) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") (internal citation omitted).

Class Counsel also declares that Plaintiff has provided assistance throughout this litigation, has expended hours in advancing this case and conferred with Class Counsel on numerous occasions and, although Plaintiff did not personally attend all of the mediations, he was available by phone, and reviewed the finalized settlement before signing it.  Further, there is no evidence of preferential treatment for certain class members because final approval is not contingent upon the court's determination of the class representative incentive awards.  Accordingly, the court finds these factors weigh in favor of settlement.

### viii.    *Balancing of the Factors*

"Ultimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation omitted).  "[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution.  This is especially true in complex class action litigation." *Id.*  Having considered the relevant factors, the court finds they all weigh heavily in favor of settlement of the Rule 23 Classes' claims.  Consequently, the court finds the settlement fundamentally fair, adequate, and reasonable.

///

///

///

///

### III.   MOTION FOR ATTORNEYS' FEES, COSTS AND CLASS REPRESENTATIVE PAYMENTS

### A.  Attorneys' Fees

In, *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d. 988, 993-94, (9th Cir. 2010), the Ninth Circuit held that the "plain text of [Fed. R. Civ. P. 23(h)] requires that any class member be allowed an opportunity to object to the fee 'motion' itself, not merely to the preliminary notice that such a motion will be filed." Here, Plaintiff timely filed his fee motion on April 1, 2024, seeking $14,625,000 or 25% of the Settlement Fund be awarded to Class Counsel. No class member has filed an objection to the request in the time allotted to file objections.

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). However, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to the amount." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d at 946. That Defendant has agreed in the settlement not to oppose Counsel's request for $14,625,000 "does not detract from the need carefully to scrutinize the fee award." *Staton*, 327 F.3d at 964.

Additionally, the FCRA and CCRAA provide for reasonable attorney's fees and costs as determined by the court. *See* 15 U.S.C. §§ 1681n(a)(3) ("In the case of any successful action to enforce any liability under this section, [the court may award] the costs of the action together with reasonable attorney's fees as determined by the court," against "[a]ny person who willfully fails to comply with the FCRA); 15 U.S.C. §1681o(a)(2) (same for negligent violations of the FCRA); CAL. CIV. CODE § 1785.31(d) (the CCRAA provides that "the prevailing plaintiffs in any action commenced under this section shall be entitled to recover court costs and reasonable attorney's fees.").

In a common fund case such as this one, the court has discretion to choose either the lodestar method or the percentage-of-the-fund method when calculating reasonable attorneys' fees. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).

When employing their discretion and utilizing the percentage-of-recovery method, federal "courts typically calculate 25% of the [common settlement] fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d at 942 (citation omitted). The lodestar method, "requires multiplying a reasonable hourly rate by the number of hours reasonably expended on the case." *Shirrod v. Dir., Office of Workers' Comp. Programs,* 809 F.3d 1082, 1086 (9th Cir. 2015).

### 1. Percentage of the Fund

In assessing the reasonableness of the award in common fund percentage award cases, the Ninth Circuit has provided a non-exhaustive list of factors to be used, including:

> the extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash settlement fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis."

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954-55 (9th Cir. 2015).

Here, Class Counsel submits that awarding $14,625,000 or 25 percent of the settlement fund is reasonable "in light of the exceptional results achieved, the very real risks of no recovery posed by continued litigation, Class Counsel's skilled prosecution of the case …, and the fact that courts in similar class actions routinely award 25% or more in fees in similar cases." Doc. No. 316 at 9.

As the court has acknowledged above, the settlement amount of $58,500,000 confers substantial benefits upon the settlement classes, indeed it is represented to be one of the largest recoveries in the history of the FCRA. *See, e.g., In re: Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011) (FCRA settlement involved 190 million class members, creation of $110 million common fund (of which $75 million was in cash and the other $35 million was the estimated value of the relief in kind included in the settlement), and capped attorneys' fees at $18.75 million). Additionally, not only does the

settlement here provide monetary relief to members of the class, it also directly addresses the claims at issue in this case by providing substantive non-monetary relief.  Even though this injunctive relief is difficult to ascertain and is not included as part of the value of the common fund, "courts should consider the value of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees, rather than as part of the fund itself."  *Staton,* 327 F.3d at 974 (specifically holding that "only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees.").  All told, the results achieved weigh in favor of granting Class Counsel's requested fee award.

The continued risk of litigation, the necessity to prove Defendant's willful or negligent conduct, along with Defendant's defenses that could have prevented classwide recovery, are factors that support Class Counsel's request.  *See McGrath v. Wyndham Resort Dev. Corp.,* No. 15cv1631 JM (KSC), 2018 WL 637858, at *8 (S.D. Cal. Jan. 30, 2018) (finding request of one-third of $7.25 million common fund reasonable where continued litigation posed "significant risk of no recovery"); *In re Heritage Bond Litig.,* No. 02-ML-1475 DT, 2005 WL 1594403, at *20 (C.D. Cal. June 10, 2005) ("the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award.")

The experience of Class Counsel in litigating class actions of this type provide further support for the request, with Class Counsel being nationally recognized leaders in FCRA class action litigation.  Class Counsel were successful in defending against a motion to dismiss and strike, were involved in often-contentious discovery and related motions, analyzed voluminous and complicated data regarding millions of reports issued by Defendant, and participated in lengthy settlement negotiations that were ultimately successful.  All of this was done against experienced and quality defense counsel.  *See In*

*re Heritage Bond Litig.,* 2005 WL 1594403, at *20 (noting "the quality of opposing counsel is important in evaluating the quality of Plaintiff's counsel's work.").

Additionally, Class Counsel took this case on a contingency fee basis and assumed the risk of non-payment which weighs in favor of the award.  Indeed, Class Counsel declares that firm expended $897,296.75 in out-of-pocket costs and worked 7,541.40 hours pursuing this litigation, maintaining that "due to the investment that litigating this case required, Class Counsel had to forego other representation."  Doc. No. 316-1 at ¶ 16.  *See Reyes v. Experian Info. Sols., Inc.,* 856 F. App'x 108, 110 (9th Cir. 2021) (holding that class counsel assumed significant risk where theory of liability had little support in existing FCRA caselaw); *In re Quantum Health Res., Inc. Sec. Litig.,* 962 F. Supp. 1254, 1257 (C.D. Cal. 1997) ("Because payment is contingent upon receiving a favorable result for the class, an attorney should be compensated both for services rendered and for the risk of loss or nonpayment assumed by accepting and prosecuting the case.").

Moreover, awards in similar actions support the requested 25% of the common fund. *See Steinberg v. CoreLogic Credco, LLC,* No. 3:22-cv-00498-H-SBC, 2024 WL 1546921, at *8 (S.D. Cal. Apr. 9, 2024) (finding requested amount of 25% of total settlement in FCRA case "in line with what other district courts in this Circuit have awarded in cases in which class counsel took the case on a contingency basis and no class member objected to the settlement.") (citing *Ochinero v. Ladera Lending, Inc.*, No-19-cv-1136-JVS-ADSx, 2021 WL 4460334, at *8 (C.D. Cal. July 19, 2021)); *Ramirez v. Trans Union, LLC,* No. 12-cv-00632-JSC*,* 2022 WL 17722395, at *10 (N.D. Cal. Dec. 15, 2022) (finding award of 46% of the settlement fund in FCRA case appropriate under the circumstances); *Tapia v. Frontwave Credit Union,*  No. 20cv1950-MMA-JLB, 2021 WL 3400990, at *6 (S.D. Cal. Aug. 3, 2021) (awarding 33.33% of the gross settlement fund in FCRA, CCRAA and California Investigative Consumer Reporting Agencies Act claims case);

Finally, the reaction of the class to the settlement supports the fee application as only two (2) class members have objected and only seventy (70) out of approximately 705,000 class members request exclusion.  *See In re Heritage Bond,* 2005 WL 1594403, at *21

1
2
("The existence or absence of objectors to the attorneys' fee award is a factor in determining the appropriate fee award") (citation omitted).

3
4
In sum, all of the factors support Class Counsel's request for an award of 25% of the settlement fund.

5
## 2. Lodestar Method

6
7
8
9
While the court need not engage in a full-blown lodestar analysis when the primary basis remains the percentage method, the calculation is meant to provide a "useful perspective on the reasonableness of a given percentage award." *Vizcaino,* 290 F.3d at 1050.

10
11
12
13
14
15
"In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers City of L.A,* 796 F.2d 1205, 1210-11 (9th Cir. 1986), *amended on denial of reh'g*, 808 F.2d 1373 (9th Cir. 1987). The number of hours billed must equal the number of hours that can reasonably be billed to a private client. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

16
17
18
19
Class Counsel have submitted a lodestar calculation with their request. (Doc. No. 316 at 26-30.) Class Counsel declare a total of 7,541.40 hours have been worked on this case.[9] The calculated lodestar for these hours is $5,412,925.50. Class Counsel's loadstar calculation results in a multiplier of 2.7. Counsel calculates the lodestar with hourly rates

20
21
22

23
24
25
26
27
[9] This figure does not account for the work Class Counsel will do on the case through final approval, for example: responding to settlement-related inquiries, monitoring the settlement administration process, drafting the motion for final approval, and preparing for the final approval hearing. (Doc. No. 316-1 at ¶ 31.) However. "[t]ime spent obtaining an attorneys' fee in common fund cases is not compensable because it does not benefit the Plaintiff class." *In re Wash. Public Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994).

28

32

for attorneys ranging from $350 to $1180 an hour, with paralegals being billed at $350 and $425 an hour.

In support, Class Counsel have submitted a declaration from Ms. Drake attesting to the hours worked and billing rates, a Berger Montague firm profile, a list of FCRA cases, the experience and qualifications of the case team, and a list of class action matters that Berger Montague's customary rates have been approved.  (Doc. No. 316-1 ¶¶ 12,14, 37-45; Doc. No. 316-2.)  Ms. Drake declares her hourly rate is $1,1180 an hour and the work performed by the individuals at the Berger Montague firm is summarized on a chart, along with each person's hourly rate, hours worked, lodestar, and their varying years of experience.  (*See* Doc. No. 316-1 at ¶ 44.)   The chart identifies 3 associates, 13 counsel/senior counsel, 1 shareholder, 1 executive shareholder, 3 paralegals, 1 law clerk and 1 legal assistant as being on the case team.  (*Id.*)  Ms. Drake attests that "[i]n an attempt to litigate this case efficiently, Class Counsel assigned work – including oral arguments and depositions – to junior attorneys whenever possible…. All told associates and counsel accounted for 72% of Class Counsel's attorney hours." *Id.*  at ¶ 38.  The underlying entries for each individual timekeeper, along with a brief description of the task being performed, were also provided.  (*See* Doc. No. 316-3.)

### i.    *Reasonableness of Rates*

"[C]ourts are required to evaluate the reasonableness of counsel's fees, regardless of a challenge by opposing counsel." *Kries v. City of San* Diego, No. 17-cv-1464-GPC-BGS, 2021 WL 120830, at *6 (S.D. Cal. Jan. 13, 2021) (citation omitted).  As an initial matter, the court finds the cases cited by Class Counsel do not necessarily reflect reasonable rates of consumer law attorneys in the Southern District of California.  Class Counsel relies on cases from the Eastern District of Pennsylvania, Northern District of California, Santa Clara Superior Court, San Francisco Superior Court and King County Superior Court.  (Doc. No. 316-1, 23-24.)  But "[t]he relevant community is the forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 979 (9th Cir. 2008) (citing *Barjon v. Dalton,* 132 F.2d 496, 500 (9th Cir. 1997)).  Moreover, Class Counsel cite to opinions

from 2018 and 2019 but it is inappropriate for the court to consider cases applying "market rates in effect more than two years *before* the work was performed." *Bell v. Clackamas Cty.,* 341 F.3d 858, 869 (9th Cir. 2003) (emphasis in original).  With little evidence, aside from Class Counsel's declaration to support the fee request before the court, the court may "rely on its own familiarity with the legal market" to determine the reasonable rates of members of the Berger Montague firm. *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).

Here, Class Counsel is seeking approval of hourly rates ranging from $450 - $1,1800 for attorneys working on this matter.  $1,1800/hour is sought for senior shareholder, E. Michelle Drake, who has 24 years of experience working on consumer protection, improper credit reporting, and other illegal business practices cases, and has received numerous professional accolades.  (Doc. No. 316-1 ¶¶ 7, 9.)  $865/hour is requested for shareholder, John Albanese, who has 12 years of experience, including a federal clerkship and currently focuses his representation on consumer protection, FCRA, and mass tort. (*Id.* ¶ 15.)  Similarly, $870/hour is being requested for senior counsel, David Langer, who has 25 years of experience in complex litigation.  (*Id.*) Senior counsel, Zachary Vaughan's proposed market rate is $740/hour, he has 12 years of experience, including federal clerkships on the United States Court of Appeals for the Third Circuit and the United States District Court, and his current work focuses primarily on consumer class actions concerning financial and credit reporting practices.  (*Id.*)  Class Counsel states the hourly rates for 9-year associate Sophia Rios is $710/hour with two 3-year associates, Ariana Kiener and Sonjay Singh, charging $610/hour and $525/hour, respectively.  Rates ranging from $350/hour up to $780/hour are being sought for the attorneys who performed document review on this case namely: Natasha Aviles (2 year attorney, $695/hour); Stephen Farese (26 year attorney, $780/hour); T'Keyak Gadson (3 year attorney, $350/hour); Adam George (2nd year law clerk, $425/hour); Joseph Hashmall (15 year attorney, $770/hour); Daniel Listwa (14 year attorney, $700/hour); Marko Milkin (17-years attorney, $425/hour); David Morse (20+ year attorney, $450 /hour); Tracie Newbins (2

year attorney, $350/hour); Kerri Petty (20+ year attorney, $725/hour); Sonjay Singh (4 year attorney, $525/hour); Virginia Vassallo (30+ year attorney, $450 /hour); Hugo Villagra (20+ year attorney, $450/hour).   (*Id.* ¶ 44.)   Additionally, Class Counsel requests reimbursement for the work support staff performed on the case at the following hourly rates: $450/hour for Jean Hibray (paralegal), $450/hour for Mary York (paralegal), $350/hour for Kaye Martin (paralegal) and $285/hour for Julie Gionnette (legal assistant). *(Id.)*

In this case, the court takes issue with the rates being requested by Berger Montague. The hourly rates are significantly above that normally charged within this legal community. For the litigation team, partner rates of $750 and associate rates of $450 have been accepted in other consumer law litigation in district courts in this community.  *See, e.g., Lardizabal v. Am. Express Nat'l Bank,* No. 22-cv-345-MMA (BLM), 2023 WL 8264435, at *7 (S.D. Cal. Nov. 29, 2023) (finding $650 an appropriate hourly rate for lawyers experienced in litigating FCRA and other consumer protection statutes, and holding $295 fee requested for associate working on the case reasonable)[10]; *Nguyen v. BMW of N. Am.*, No. 3:20-CV- 2432 JLS (BLM), 2023 WL 173921, at *3 (S.D. Cal. Jan. 12, 2023 (approving attorneys' fees of $525/hour for law firm principal with 16 years of consumer law experience, $375/hour for senior litigation attorney with 6 years of experience, $325/hour

---

[10] *See also Kries,* 2021 WL 120830, at *7-8 (approving following 2019-2020 rates for labor and employment attorneys: 30+ years of experience at $650/hour; 14 years of experience at $500/hour; 6 years of experience at $400/hour; 4 years of experience at $295/hour; 3 years of experience at $225/hour); *Lopez v. Mgmt. & Training Corp.,* Case No. 17cv1624 JM(RBM), 2020 WL 1911571, at *8-9 (S.D. Cal. Apr. 20, 2020) (approving attorneys' fee request with rates ranging from $500 to $900 per hour in wage and hour class action); *Watkins v. Hireright, Inc.*, 13-cv-1432-BAS-BLM, 2016 WL 5719813, at *3 (S.D. Cal. Sept. 30, 2016) (FCRA case where court concluded "hourly rates billed by the attorneys : $425-$525 for partners, $300-$375 for associates, and $175 for paralegals [at one firm] and $600 for Kevin Fok and $325-$450 for attorneys at A New Way of Life, are reasonable compared to other rates this Court has seen in similar cases in this community.")

for associate attorney with 3 years of experience; $140/hour for a post-bar clerk); *Buchannon v. Associated Credit Servs, Inc.,* No. 20-cv-02245-BEN-LL, 2021 WL 5360971, at *15 (S.D. Cal. Nov. 17, 2021) (holding that $575 partner rate and $375 senior associate rate reasonable considering years of FCRA experience and increase in inflation.). Accordingly, the court will cap Ms. Drake's hourly rate at the high end of $750/hour, Mr. Alabanese's at $650/hour, Ms. Kiener's at $350/hour, Mr. Langer's at $750 /hour, Ms. Rios's at $475/hour, and Mr. Vaughan's at $650/hour.

As to the document review team, a review of the submission indicates that the majority of the individuals designated as "counsel" and "senior counsel" worked solely on document review. No explanation is provided for the variance in the requested rates for the attorneys performing document review. Indeed, when it comes to some of these individuals, very little information is provided, (*see* Doc. Nol 316-1 at 13-15), making it difficult to determine if the rates of these individuals are reasonable for the work they performed on this case or what would justify the delta in the rates being requested, except the years of experience some of these individuals possess. Based on the rates set in other FCRA cases in this district in the relevant time period, the court will cap the hourly rate for all the individuals solely performing document review at $375.

Regarding the paralegal rates, Class Counsel fails to provide any case law to support the rates of its paralegals. Despite this omission, the court may consider Ms. Drake's declaration, similar cases, and its own knowledge and familiarity with the Southern District of California's legal market in setting a reasonable hourly rate for paralegal services. *See Ingram*, 647 F.3d at 928. Generally, reasonable rates for paralegals in this district have ranged from $125 to $250. *See, e.g.*, *Martinez v. Costco Wholesale Corp.*, No. 19-CV-1195-WVG, 2023 WL 2229267, at *10, (S.D. Cal. Feb. 23, 2023) (adopting as reasonable paralegal hourly rate of $250); *Durruthy v. Charter Commc'n, LLC*, No. 20-cv-1374-W-MSB, 2021 WL 6883423, at *6 (S.D. Cal. Sep. 30, 2021) ("This district has awarded paralegal fees in line with the $175 to $250 requested[.]"); *San Diego Comic Convention v. Dan Farr Prods.*, 2019 WL 1599188, (S.D. Cal. Apr. 15, 2019) ("Reasonable rates for

paralegals in this district have ranged from $125 to $225," noting $290 as being the highest paralegal rate this district has approved) (collecting cases), *attorneys fees aff'd* by 807 F. App'x 674 (9th Cir. 2020). Additionally, the most recently published United States Consumer Law Attorney Fee Survey Report in 2017-2018 announces $147 as the average paralegal billing in rate in San Diego at that time. United States Consumer Law Attorney Fee Survey Report 2017-2018, *available at* https://burdgelaw.com/wp-content/uploads/2021/11/US-Consumer-Law-Attorney-Fee-Survey-Report-w-Table-of-Cases-091119.pdf (last visited June 17, 2024).

Even accounting for inflation over the past five years, the court finds that the hourly paralegal rates being requested by Class Counsel are not justifiable. While Berger Montague may indeed be "one of the preeminent class action law firms in the United States," Doc. No. 316-1 at ¶ 4, and the court has no reason to question the quality of the work its paralegals performed, no evidence has been provided to support its paralegal rates of $350 and $450 an hour as reasonable, nor does the court's familiarity with the paralegal rate structure of the community support the proffered rates. Accordingly, the court will cap Class Counsel's paralegal rate at the high end of those awarded in this district, namely $290.

### ii.    *Reasonableness of the Hours Expended*

Even though the court need not closely scrutinize each claimed attorney-hour, some review is required. As the moving party, Class Counsel "bears the burden of documenting the appropriate hours spent in litigation and submitting evidence in support of the hours worked." *Hensley v. Eckerhard, 461 U.S. 423, 433 (1983).* Hours should not be counted if they are excessive, redundant, or otherwise unnecessary. *Id.* at 434.

Here, Class Counsel assert 7,541.40 hours have been worked on this case and a copy of the underlying entries was provided. (Doc. No. 316 at 27; Doc. No. 316-1 ¶ 37; Doc. No. 316-3.) A review of the chart illustrates that it contains entries that do not furnish detailed descriptions of the work performed *e.g.*, "Doc review," (*see, e.g.,* Doc. No 316 at 27, and "team strategy meeting," *id.,* at 26). Additionally, some of the work performed by

a legal assistant or paralegals could have been assigned to a legal secretary and billed at a much lower rate than the requested $350-$450.00/hour, (*see, e.g.*, "review and update chart case dates and deadlines, and update case calendar, send invites/reminders, Doc. No. 316-3 at 4, "review and update case files in Imanage with pleadings and emails," *id*. at 6, "calendar deadlines," *id*. at 7, and "run updates, charge up tablets, set up FedExs deliveries and travel to/from to send out to witnesses," *id* at 28). *Butler v. Homeservices Lending LLC*., No. 11-CV-02313-L MDD, 2014 WL 5460477, at *4 (S.D. Cal. Oct. 27, 2014) ("[Plaintiff} may not bill at paralegal rates for clerical and/or secretarial work."). And, "[p]urely clerical tasks are generally not recoverable on motion for attorney's fees as they should be considered a part of the firm's overhead rather than billed to a client." *Kries*, 2021 WL 120830 at *11. Nevertheless, at bottom, the work entries generally appear reasonable and necessary under the circumstances.

### iii. *Lodestar conclusion*

Applying the suggested modified rates above, while leaving the hours expended untouched, gives a lodestar of $3,709,689 compared with Class Counsel's $5,412,925.50. This in turn, results in a multiplier of 3.9 compared with the lodestar multiplier of 2.7 Class Counsel's calculations produced. Multipliers of 1 to 4 are commonly awarded in complex class action cases in the Ninth Circuit. *See Figueroa v. Cap. One, N.A.,* No. 18cv692 JM(BGS), 2021 WL 211551, at *10 (S.D. Cal. Jan. 21, 2021) (approving lodestar multiplier of 3.35*); Patel v. Axesstel,* No. 3:14-CV-103-CAB-BGS, 2015 WL 6458073, at *8 (S.D. Cal. Oct. 23, 2015) ("Class counsel also points out that the Court could arrive at this total using the lodestar method with a 1.38 multiplier, which is well within the range of 1.0 to 4.0 often used by district courts in common fund case.") (citing *Kakani v. Oracle Corp.,* No. 06-06493WHAT, 2007 WL 4570190, at *2(N.D. Cal. Dec 21, 2007) ("Although the range of multipliers used by district courts in common-fund cases varies widely, an overwhelming majority of district courts have used between 1.0-4.0 as the multiplier.")). *See also Vizcaino,* 290 F.3d at 1051 (upholding a 28% fee award that

constituted a 3.65 lodestar multiplier). Either of these lodestar calculation, therefore, support the 25% fee award.

### iv.   Conclusion Regarding Attorneys' Fees Request

Thus, guided by the principle that it is incumbent upon it to award fees for work that was reasonable and necessary under the circumstances, the court finds the full 25% benchmark award requested is appropriate in this case. This finding reflects the very positive result achieved for the classes, the novel legal issue litigated, the contingent nature of the litigation, and the important changes Defendant has agreed to make to its OFAC search practices and how this information is disclosed to third parties. *See Spann v. J.C. Penny Corp.,* 211 F. Supp. 3d 1244, 1263 (C.D. Cal. 2016) ("As always, when determining attorneys' fees the district court [is] guided by the fundamental principle that fee awards out of common funds be reasonable under the circumstances.") (quoting *Glass v. UBS Fin. Servs., Inc.,* 2007 WL 2211862, at *14 (N.D. Cal. 2007) *aff'd* 331 Fed. Appx. 452 (9th Cir. 2009)). Accordingly, the court awards Class Counsel attorneys' fees in the amount of $14,625,000.

### B.  Settlement Administration Costs

Per the terms of the Settlement and Preliminary Approval Order, Angeion Group was approved as the Settlement Administrator and is to be paid from the Settlement Fund. Originally, Angeion anticipated its costs would be approximately $1,425,000 based on a 7-9% claims rate, (Doc. No. 295 at 14), which after amendment to the settlement agreement, it increased to approximately $2,150,000, (Doc. No. 306 at 10-11).

Class Counsel now request the court to approve reimbursement to Angeion for the costs associated with notice and claims administration, in an amount not to exceed $2,135,228. (Doc. No. 316 at 14-15.)

Angeion's President and Chief Executive Officer, Steven Weisbrot, attests that as of the date of May 24, 2024, Angeion has incurred approximately $902,903.59 in costs to provide notice and administration services. (Doc. No. 329 ¶ 28.) Despite the court's caution in the Preliminary Approval Order that it expected the settlement administration

costs to be lower than projected, (*see* Doc. No. 309 at 30), nothing has been produced to illustrate why Angeion cannot reduce its actual fees and costs to accommodate the 31,359 claim forms that have been submitted specifying payment preferences (*see id*. at ¶ 25). And while Mr. Weisbort declared that "Angeion will provide an updated accounting of administrative services prior to the Final Approval Hearing," as of the date of this order, no such accounting has been provided.  Nevertheless, the court has no reason to doubt Mr. Weisbrot's approximation that the administration and notice costs will remain at approximately $2 million.  Mindful of how challenging it can sometimes be to accurately determine the actual costs of administrating large settlements, the court approves class administrator fees not to exceed $2,135,228, absent further order of the court.

## C.  Costs

Federal Rule of Civil Procedure 23 permits a court to "award reasonable attorney's fees and nontaxable costs that are authorized by law of by the parties' agreement."  Fed. R. Civ. P. 23(h).  Under the "common fund doctrine," "a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees."  *In re Apple Inc., Device Performance Litig.,* 50 F.4th 769, 785 (9th Cir. 2022) (quoting *Vincent v. Hughes Air W., Inc*., 557 F.2d 759, 769 (9th Cir. 1977)).  The fundamental purpose of the doctrine "is to spread the burden of a party's litigation expenses among those who are benefitted."  *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 271 (9th Cir. 1989).  In sum, Class Counsel are entitled to reimbursement of the out-of-pocket costs they reasonably incurred investigating and prosecuting this case.  *See In re Media Vision Tech. Sec. Litig*., 913 F. Supp. 1362, 1366 (N.D. Cal. 1996) (citing *Mills v. Electric Auto-Lite Co*., 396 U.S. 375, 391-92 (1970)); *Staton,* 327 F.3d at 974.

Regarding the approximately $900,000 sought in costs, the initial submission from Class Counsel simply informed the court that "the bulk of these costs were for expert fees, however they also encompass deposition-related costs (e.g., court reporters, videographers, and transcripts), jury consultant fees, mediation expenses, filing fees, legal research, travel-

related expenses (limited to coach-class airline tickets), document hosting, meals (excluding alcohol) and hotels, service of process, and expenses related to copying, shipping, and scanning." (Doc. No. 316 at 30.)  A table summarizing the categories of costs is set forth below.  However, very little information was provided to the court to substantiate this request.

In response, on April 16, 2024, the court issued an order requesting additional information surrounding the following requests: (1) testifying experts; (2) consulting experts and outside counsel; (3) transcripts; (4) E-discovery hosting; (5) computer research; and (6) travel.  (*See* Doc. No. 318.)  Class Counsel duly responded, (*see* Doc. No. 320)[11].

The court has reviewed the additional information provided, via the second declaration of Ms. Drake on behalf of Class Counsel and finds many of the requested litigation costs reasonable.  The chart below summarizes the original amounts requested and amended amounts.

| Expense Category | Original Total | Supplemental Declaration |
|---|---|---|
| Testifying Expert Fees | $552,546.85 | $510,203.00 |
| Consulting experts and outside counsel | $209,012.29 | $246,287.29 |
| Transcripts | $60,796.29 | $65,562.97 |

---

[11] In connection with Plaintiff's response, Plaintiff also filed a Motion to Seal (Doc. No. 321), seeking to seal portions of Class Counsel's Supplemental Declaration that reveal the identities of Plaintiff's consulting experts.  Good cause appearing, the court **GRANTS** Plaintiff's Motion to Seal Portion of Supplemental Declaration in Support of Plaintiff's Motion for Attorneys' Fees, Costs and Relief from Local Rule (Doc No. 321).  *See Zeiger v. WellPet LLC*, No. 17-CV-04056-WHO, 2018 WL 3208160, at *3 (N.D. Cal. June 29, 2018) (sealing, under good cause standard, portion of leave to amend briefing that "relates to the identity of plaintiffs' consulting expert" and identifies potential testifying expert where the party was "not yet compelled to identify [the expert] under Federal Rule of Civil Procedure 26(a)(2)").

| | | |
|---|---|---|
| E-Discovery Hosting | $22,181.66 | $22,181.66 |
| Mediation Fees | $21,000.00 | $21,000.00 |
| Computer Research | $15,664.01 | $15,664.01 |
| Travel | $5,764.22 | $5764.22 |
| Service Fees | $3,689.05 | $3,689.05 |
| Filing & Misc. Fees | $3,401.71 | $3,401.71 |
| Printing & Copying | $2,439.70 | $2,439.70 |
| Delivery & Postage | $709.21 | $709.21 |
| Docusign | $91.76 | $91.76 |
| Final Approval Travel | | $1000.00 |
| **Total** | **$897,296.75** | **$897,296.58** |

*Compare* Doc. No. 316-1 at 21 *with* Doc. No. 320 at 18-19.

The court has reviewed the expert fees and finds the following to be reimbursable: (1) Professor Adam Levitin, retained to provide rebuttal expert report, at cost of $62,975; (2) Duncan Levin, retained to provide rebuttal expert report, at cost of $137,842.50; (3) Dr. Knoblock, retained to provide rebuttal expert report, at cost of $61,842.50; (4) Dr. Singer, retained to provide opening expert report and rebuttal report, at cost of $118,776; (5) Mr. Jaffe, retained to provide expert data analysis and author opening and rebuttal reports, at cost of $97,317; (6) Mr. Hendricks, retained to provide opening and rebuttal reports, at cost of $31,450  The cost of these experts totals $510,203.00.

Similarly, the court finds the following consulting fees and outside counsel fees paid to be reasonable and reimbursable: (1) Class Experts Group, LLC was paid $96,983.75 for the purchase of consumer data and the processing of same; (2) Mr. Bell was paid $37,725.00 for his expert and technical assistance regarding the LexisNexis product; (3) Klehr Harrison Harvery Branzburg LLP was paid $46,459.34 in fees related to quashing a subpoena to produce documents Defendant issued on Class Counsel; (4) Richard M. Ochroch & Associates, P.C. was paid $7969.50 in fees to analyze specific portions of

Defendant's insurance coverage tower; (5) Hartley LLP was paid $15,747.98 in fees related to Dr. Singer's response to Defendant's subpoena to produce documents. The cost of these consulting experts and outside counsel services total $204,435.57.

However, the court has determined that the $41,851.72 paid to Law Media Productions, LLC should not be reimbursed. This company was "retained to conduct a series of jury focus groups." Doc. No. 322 at 9. The focus groups appear to have taken place March 19, 2023 – March 23, 2023. But a Joint Motion to Continue/Modify Amended Scheduling Order, filed on February 23, 2023, indicates that a mediation was set for April 27, 2023, with the Parties stating that they "have also begun to seriously discuss resolution." (Doc. No. 166. at ¶ 9.) In addition, the jury focus groups occurred before Plaintiff's class certification motion was filed and motions for summary judgment were not yet briefed nor filed. Moreover, the cases relied upon by Class Counsel to justify this request are readily distinguishable from the case at bar, as they involved jury consultant fees being awarded in in cases that settled on the eve of trial. *See, e.g., New Form, Inc. v. Sabina Corp.*, No. 2:02-cv-02296-FMC-Ex, 2008 WL 11336584, at *1 (C.D. Cal. July 2, 2008) (disallowing request for jury consultant fee reimbursement).

Class Counsel have substantiated the $65,562.97 in fees related to transcripts, therefore, these should be reimbursed. So should the $22,181.66 in e-Discovery hosting as Class Counsel has attested that this amount "pertain[s] only to data stored on Relativity that pertained to *this case* [and include] [other] services related to data management and organizing documents to facilitate efficient review." Doc. No. 322 at ¶ 31.

As for the computer research costs of $15,664.01, Ms. Drake on behalf of Class Counsel, attests that her firm splits the monthly Westlaw fee it is charged "equally amongst all entered client/matter billing numbers for a given month, in proportion to the client/matter's share of the gross charges." Doc. No. 322 at ¶ 35. She further attests that her colleague, Sophia Rios, who is an attorney in the Southern District of California, has advised her "that is the prevailing practice in this area for attorneys to separately bill their clients for computer research costs, rather than include such costs in their hourly rates."

The court, therefore, finds the costs related to computer research costs reimbursable.  *See, e.g., Reddick v. Metro. Life Ins. Co.*, No. 3:15-CV-02326-L-WVG, 2018 WL 637938, at *5 (S.D. Cal. Jan. 31, 2018) (finding it "consistent with the Court's experience" and "customary in this region" for legal research service charges, and various monthly office fees for "telephone, facsimile transmission, in house document scanning, photocopying, and normal non-overnight postage" to be separately billed to clients separately from hourly rates).

Class Counsel also seeks $5,754.22 in travel costs as set forth in Exhibit C, (Doc. No. 320-3).  Ms. Kiener and Ms. Drake both attended the 3-day jury focus groups held by Law Media Productions.  Ms. Keiner's expenses related to this trip equals $2112.98, and Ms. Drakes' equals $2204.11, for a total of $4317.09.  Having concluded that the jury focus group charges are litigation costs that should not be recouped, the court finds that the expense of attending the focus groups should also not be reimbursed.  The additional $1447.13 requested in expenses related to Ms. Drake appearing at the Preliminary Approval Hearing are reasonable and should, therefore, be reimbursed.

Taking the foregoing into account, the court awards $851,825.77 in costs.

## D. Class Representative Payments

Although "incentive awards are fairly typical in class action cases," they are discretionary.  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). "Generally, when a person joins in bringing an action as a class action he has disclaimed any right to a preferred position in the settlement."  *Staton*, 327 F.3d at 976.  (internal ellipses, quotations, and citation omitted).  The purpose of incentive awards, therefore, is "to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Rodriguez,* 563 F.3d at 958-59.  However, "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives."  *Radcliffe v. Experian Info. Solutions Inc.,* 715 F.3d 1157, 1164 (9th Cir. 2013).

In the settlement papers, the named Plaintiff asks for incentive award of $20,000. Ms. Drake, on behalf of Class Counsel, declares that named Plaintiff "has served as an exemplary Class representative," (Doc. No. 316-2 at ¶ 48), expending hours advancing this litigation, responding to fifty-one (51) written discovery requests, and producing thousands of pages of documents which including disclosing personal information. (Doc. No. 316-2 ¶¶ 48, 50.) Ms. Drake attests that Plaintiff also sat for a deposition, attended a full-day mediation, as well as a settlement conference, and made himself available to Counsel throughout settlement negotiations. (*Id.* ¶ 48.) Further, Ms. Drake commends Plaintiff for "dedicat[ing] himself to achieving the best results feasible in this litigation." *Id*. Mr. Fernandez submitted a declaration in support of the request, (Doc. No. 316-4), estimating that he has spent upwards of 100 hours working on this case (*id.* at ¶ 11). As part of the Settlement, Plaintiff is signing a broader release than other members of the class and is also releasing his individual failure to investigate claim against Defendant.

Given Plaintiff's level of involvement in the case, the undertaking of the risk in bringing this action, and the fact the amount of the request is consistent with those typically awarded as incentive payments, the court determines that Plaintiff's request is reasonable. *See, e.g., In re BofI Holding, Inc. Sec. Litig.,* Nos: 3:15-CV-02324-GPC-KSC, 3:15-CV-02486-GPC-KSC, 2022 WL 9497235, at *8, 11 (S.D. Cal. Oct. 14, 2022) (finding a "$15,000 service award constitutes only .1% of the total $14,100,000 recovery" and was therefore "fair and reasonable."); *Johnson v. U.S. Bank Nat'l Ass'n.,* No. 19-CV-286 JLS (LL), 2020 WL 13652583, *3 (S.D. Cal. Aug. 20, 2020) (court considered broader release signed by class representatives and dismissal of pending claim when awarding $15,000 - $25,000 to class representatives); *McGrath,* 2018 WL 637858, at *11 (awarding $10,000 to class representative); *Beaver v. Tarsadia Hotels,* No. 11-cv-01842-GPC-KSC, 2017 WL 4310707, at *7-8 (S.D. Cal. Sept. 9, 2017)(approving four class representative awards of

$50,000) (collecting cases).[12]   There are no circumstances indicating that the award would create a conflict between the named Plaintiff and class members.  Accordingly, Plaintiff Fernandez is awarded $20,000 as a service award.

## IV.   CONCLUSION

In accordance with the foregoing, the court **ORDERS** as follows:

1. The court **GRANTS** final approval of the proposed Settlement Agreement (Doc. No. 306-1);

2. Class Members are defined as:

**Inaccurate Reporting Class**:
All individuals who were the subject of an OFAC Report that Defendant disseminated to a third party from June 3, 2013 through August 28, 2023, where the OFAC Report reported at least one hit, match, possible match, or "record for review."
**Failure to Disclose Class**:
All individuals (i) who were the subject of an OFAC Report that Defendant disseminated to a third party from June 3, 2015 through August 28, 2023, where the OFAC Report reported as least one hit, match, possible match or "record for review;" and (ii) who made a request to Defendant for their consumer file or report after such OFAC Report had been disseminated.
**Failure to Identify Class**:
All individuals who, from June 3, 2015 to June 30, 2021, made a request to Defendant and to whom Defendant provided a consumer file disclosure.

*An OFAC Report is a report disseminated by Defendant that included any one of only the following products sold by Defendant: ProScan OFAC, Bureau OFAC (meaning OFAC reporting involving Equifax, Experian, and/or TransUnion), LoanSafe Fraud Manager, LoanSafe Risk Manager OFAC, and ProScan ID Index OFAC.

---

[12] *See also Bova v. JPMorgan Chase Bank, N,A.,* No. 07cv3410 AJB (JMA), 2011 WL 13176812, (S.D. Cal. Oct. 14, 2011) ($20,000 class representative award); *Singer v. Becton Dickinson & Co*., No. 08-CV-821-IEG (BLM), 2010 WL 2196104, at *9 (S.D. Cal. June 1, 2010) ($25,000 award).

Class period is defined as follows:

The Inaccurate Reporting Class and Failure to Disclose Class have a Class Period of June 3, 2013, through August 28, 2023, whereas the Failure to Identify Class Period spans from June 3, 2015 to June 30, 2021.

3.  This order applies to all claims or causes of action settled under the Settlement Agreement and binds all Class Members who did not affirmatively opt-out of the Settlement Agreement by submitting a timely and valid Request for Exclusion. This order does not bind persons who filed timely and valid Requests for Exclusion;

4.  Plaintiffs and all Class Members who did not timely submit a valid Request for Exclusion are: (1) deemed to have released and discharged Defendant from any and all Released Claims accruing during the Class Period; and (2) barred and permanently enjoined from prosecuting any and all Released Claims against the Released Parties. The full terms of the releases described in this paragraph are set forth in section 4.4 of the Settlement Agreement and are specifically incorporated herein by this reference;

5.  The Settlement Administrator will issue individual settlement payments to participating Class Members according to the terms and timeline stated in the Settlement Agreement;

6.  The court **GRANTS** Plaintiffs' motion for attorneys' fees, costs and class representative payments (Doc. No. 316). The court **GRANTS** Class Counsel attorneys' fees in the amount of $14,625,000 and $851,825.77 in costs from the Settlement Fund. The Settlement Administrator shall pay Class Counsel from the Settlement Fund within ten (10) days of Final Approval of the Settlement, as set forth in Paragraph 3.2(b) of the Settlement Agreement;

7.  The court **GRANTS** a class representative award of $20,000 to Plaintiff Marco A. Fernandez to be paid from the Settlement Fund. The Settlement Administrator shall pay Plaintiffs from the Settlement Fund within ten (10) days of the Final

20cv1262 JM(SBC)

Approval of the Settlement, as set forth in Paragraph 3.2(b) of the Settlement Agreement;

8. The court **APPROVES** settlement administrator costs not to exceed $2,135,228.00, absent further order of the court. Payment shall be made from the Settlement Fund to Angeion pursuant to the timeline stated in the Settlement;

9. The court **OVERRULES** any objections to the Settlement. After carefully considering each objection, the court concludes that neither of the objections create questions as to whether the settlement is fair, reasonable, and adequate.

10. In accordance with the provisions of the Settlement Agreement and Preliminary Approval Order, the persons listed on Exhibit 1 hereto have validly excluded themselves from the Settlement Classes and the terms of this Order[13]. Moreover, as the settlement is being reached as a compromise to resolve this litigation, including before a final merits determination on the issues, none of the individuals identified in Exhibit 1 may invoke the doctrines of res judicata, collateral estoppel, or any state law equivalents to those doctrines in connection with any further litigation against Defendant in connection with the claims settled by the Settlement Classes;

11. The court retains continuing jurisdiction over this Settlement solely for the purposes of enforcing the agreement, addressing settlement administration matters and addressing such post-judgment matters as may be appropriate under court rules and applicable law; and

---

[13] In connection with Plaintiff's Motion for Final Approval of Class Action Settlement, the Parties separately filed a Joint Supplemental Motion for Exclusion of Opt-Outs (Doc. No. 333). The Parties request that the court append to an order finally approving the Settlement a list of the individuals who have submitted timely and compliant requests for exclusion from the Settlement. The court hereby **GRANTS** the motion (Doc. No. 333-1), the list of individuals set forth as Exhibit A to the Declaration of Lacey Rose (Doc. No. 333-1) is appended to this order as Exhibit 1 and shall constitute the list of all individuals who have validly opted out of the Settlement.

12.  Judgment is entered on the terms set forth above.  The Clerk of the Court shall close the case.

**IT IS SO ORDERED**.

Dated:  June 24, 2024

_____

Hon. Jeffrey T. Miller
United States District Judge

20cv1262 JM(SBC)